**Johnny ROMERO, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 46281.**

Court of Criminal Appeals of Texas.

April 18, 1973.

J. A. Canales, Corpus Christi, for appellant; appointed on appeal only.

William B. Mobley, Jr., Dist. Atty., and John Potter, Asst. Dist. Atty., Corpus Christi, Jim D. Vollers, State's Atty., Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for sale of heroin wherein the punishment was assessed at twenty (20) years.

At the outset, appellant urges that the court erred "as a matter of law" in admitting into evidence, over objection, the results of a lie-detector or polygraph test. The State contends that the same was admissible by virtue of a pre-trial written agreement and stipulation entered into prior to the polygraph test. Both State and appellant believe that the question presented is one of first impression in this jurisdiction.

Prior to trial, the appellant filed a motion in limine to prevent the State from using the results of said test by contending that, contrary to the agreement, the polygraph operator was not qualified, and, fur-

ther, contrary to the agreement, the appellant was given the drug "Methadone" though he was not to be given any drugs for 48 hours prior to the test.

At the hearing on the motion, it was shown that on December 15, 1970, several days after the return of the indictment, the following stipulation was entered into:

### STIPULATION

We, Ed Williams, Attorney for the undersigned Defendant, Johnny Romero, Defendant, and Phil Westergren, State's Attorney, hereby agree and stipulate that the lie detector test given to the Defendant on the 15th day of December, 1970, may be admitted into evidence at the trial of said Defendant, by either party, provided that no such evidence can be admitted unless the examiner first testifies, out of the presence of the Jury, that his offered testimony, in his opinion, is probative.

/s/ Johnnie Romero
Defendant

/s/ Ed P. Williams
Attorney for Defendant

/s/ Phil Westergren
Attorney for the State

Subscribed and sworn to before me, on this the 15 day of December, A.D.1970.
. . . ."

At this time appellant was in custody and was taken from the jail to the Department of Public Safety office in Corpus Christi. The appellant offered evidence to show that Edwin De Sha, the polygraph operator for the Department of Public Safety, had only an intern's license at the time of the test,[1] and that at 8 p. m. on December 14, the evening before the test on the morning of December 15, the appellant had been given one Methadone tablet. Appellant contends this violated the agreement to stipulate.

[1] See Article 4413 (29cc), Vernon's Ann.Civ.St.

The State countered with evidence that the operator's intern's license was on the wall of the room where the test was given in the presence of appellant's counsel, and that such counsel had been informed prior to the test that appellant had taken Methadone the night before and had thereafter agreed to the test; that Dr. Rupp had been called prior to the test to determine the effect of the Methadone on the results of such test.

The motion in limine was subsequently overruled.

The State's evidence at the trial on the merits reflects that 22-year old John Messer and one Williams, age 20, undercover agents for the Nueces County Sheriff, went to the Blue Note Lounge in Corpus Christi on November 24, 1970, posing as construction workers looking for employment. The lounge was shown to be owned by a Kathy Bolden. Among those present in the lounge at the time were J. D. Haywood, who was working behind the bar, Terry Murlough, alias Linda Davis, and the appellant.

While the agents were drinking beer, they were approached by Terry Murlough who propositioned Messer for a "date" and then told him he looked like a "junky." She offered to get him pills, "weed", "smack", or anything he wanted. He ordered one "paper" of "smack" or heroin for $10.00 and told the woman he would have to go get the money. Though there is some conflict in the testimony as to appellant's position in the lounge, the agents estimated he was approximately ten feet away from their table at the time of the transaction and the jukebox was not playing.

The agents went to the courthouse to obtain the money. When they returned, they say the appellant leaving. Upon their entry into the lounge, J. D. Haywood asked if they were the ones who had made arrangements with Terry Murlough and, upon receiving an affirmative answer, went to a machine and removed several "papers" and sold them one "paper" of a substance later shown to be heroin.[2]

The next day, November 25, Messer and one Sullivan returned to the lounge, contacted the Murlough woman and gave her $30.00 for more heroin. She kept stalling on the delivery of the same and finally the agents followed her from the lounge to appellant's apartment nearby where the appellant "ran" the agents off. They waited across the street until the appellant, Kathy Bolden, J. D. Haywood and Terry Murlough left the apartment and got into a car. The agents then approached the car and demanded their money or the "dope." At this point, appellant got out of the car, pulled a pistol and ordered the undercover agents away.

On November 27, 1970, Messer and other officers executed a search warrant at the Blue Note Lounge. Only J. D. Haywood and Terry Murlough were present. In the cash register they found a substance later shown to be heroin. After this discovery, they observed the appellant on the sidewalk a half a block away walking toward the lounge. He was arrested.

Terry Murlough, who admitted she was a prostitute and a dope addict and had been convicted of shoplifting and passing hot checks, testified for the State. She related that shortly before the events in question she had come to Corpus Christi with J. D. Haywood and they made contact with Kathy Bolden with whom the appellant lived and that prior to November 24 the four of them had gone to San Antonio where the appellant purchased heroin which he and J. D. Haywood "papered." She admitted that she made arrangements for the sale of heroin to Messer and Williams on November 24 and that the next day she "burned" Messer by taking his money and failing to deliver the heroin. She related another trip was made to San

2. See Haywood v. State, 482 S.W.2d 855 (Tex.Cr.App.1972).

Antonio where the appellant purchased more heroin which was again "papered" by the appellant and Haywood. She related that she was present on November 27 when the search warrant was executed and that she and Haywood had access to and control over the cash register when they were in the lounge alone, that the appellant had control when he was present, and that Kathy Bolden had control whenever she was present.

To corroborate this accomplice witness, the State offered the testimony of De Sha, the polygraph operator, that when questioned about his part in the sale on November 24, and the possession of the narcotics in the cash register, the appellant gave deceptive answers. Canty, his supervisor, also testified from the chart made by De Sha that the appellant's answers were deceptive.

The court charged on the law of principals but gave no limiting instructions on the polygraph testimony.

No machine or device has perhaps caused greater controversy among "experts", judges, lawyers, physicians, psychologists, government officials, and the public in general than the polygraph or lie-detector machine.

No reported Texas decision has described the machine and it is perhaps well to do so here.

"The polygraph machine ordinarily consists of a cardiograph which registers pulse rate, a sphygmograph which measures blood pressure, a pneumograph which measures respiration, and usually a galvanometer which measure electrodermal responses. The theory for using the polygraph to detect lies is that the act of lying causes conscious conflict in the mind of the examinee, which produces an emotion of fear or anxiety, manifested by fluctuations in pulse rate,

blood pressure, breathing, and perspiration." Pulakis v. State, 476 P.2d 474, 477–478 (Alaska Sup.1970).

See also Henderson v. State, 94 Okl.Crim. 45, 230 P.2d 495, 501 (1951); State v. Valdez, 91 Ariz. 274, 371 P.2d 894, 895 (1962); Kleinfeld, The Detection of Deception—A Résumé, 8 Fed.B.J. 153 (1947); Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694, 699–700 (1961).

In the leading case of Frye v. United States, 54 App.D.C. 46, 293 F. 1013, 1014 (1923), the Court said of the expert testimony based on a test of blood pressure fluctuations (really a monograph rather than a polygraph):

" . . . Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." [3]

In 1933 in State v. Bohner, 210 Wis. 651, 658, 246 N.W. 314, 317, 86 A.L.R. 611, the Wisconsin Supreme Court wrote:

"We are not satisfied that this instrument, during the ten years that have

3. Cases following the rule announced in the *Frye* case are numerous. Most are collected at 34 A.L.R. 147, 86 A.L.R. 616,

119 A.L.R. 1200, 139 A.L.R. 1174, 23 A.L.R.2d 1306. See also 41 A.L.R.3d 1369.

elapsed since the decision in the Frye Case, has progressed from the experimental to the demonstrable stage. . . . ." 246 N.W. at 317.

And, in Henderson v. State, 94 Okl. Crim. 45, 230 P.2d 495, 23 A.L.R.2d 1292 cert. den. 342 U.S. 898, 72 S.Ct. 234, 96 L. Ed. 673 (1951), the court, after an exhaustive review of existing authority on the reliability of lie-detector and truth serum tests, concluded:

" . . . It is therefore apparent that the efficacy of neither the lie detector or the truth serum test have gained that standing and scientific recognition nor demonstrated that degree of dependability to justify the courts in approving their use in the trial of criminal cases. Therefore, the trial court was not in error in sustaining the state's objection to the defendant's tender of the results of such test to which he contends he consented." 230 P.2d at 506.

And, ten years thereafter, a New Jersey appellate court observed,

" . . . that there is not a single reported decision where an appellate court has permitted the introduction of the results of the polygraph or lie-detector test as evidence in the absence of a sanctioning agreement or stipulation between the parties. . . . " State v. Arnwine, 67 N.J.Super. 483, 495, 171 A.2d 124, 131 (1961).[4]

This court has followed the almost unanimous view of American courts concerning the admissibility of the results of a polygraph test.

In Lee v. State, 455 S.W.2d 316, 321 (Tex.Cr.App.1970), this court wrote:

"It has been the consistent holding of this Court that evidence of the results of a lie detector or polygraph test is not admissible on behalf of either the State or the defendant."

See Renesto v. State, 452 S.W.2d 498 (Tex.Cr.App.1970); Hart v. State, 447 S. W.2d 944 (Tex.Cr.App.1970); Wall v. State, 417 S.W.2d 59 (Tex.Cr.App.1967); Placker v. State, 171 Tex.Cr.R. 406, 350 S.W.2d 546 (Tex.Cr.App.1961); Stockwell v. State, 164 Tex.Cr.R. 656, 301 S.W.2d 669 (Tex.Cr.App.1957); Peterson v. State, 157 Tex.Cr.R. 255, 247 S.W.2d 110 (Tex. Cr.App.1951), rehearing denied 157 Tex. Cr.R. 255, 248 S.W.2d 130 (Tex.Cr.App. 1952). See also Davis v. State, 165 Tex. Cr.R. 456, 308 S.W.2d 880 (1958); Nichols v. State, 378 S.W.2d 335 (Tex.Cr.App. 1964). And, in Watkins v. State, 438 S. W.2d 819, 822 (Tex.Cr.App.1969), the court noted such results were not admissible for any purpose for either the State or defense.

Judicial reluctance to accept the admissibility of polygraph test results continues. The courts have been particularly sensitive to the potential sources of error in the ascertainment of error through polygraph examinations. In Henderson v. State, 230 P.2d 495, 501–502 (1951), the Oklahoma Court of Criminal Appeals noted five factors responsible for error in these examinations: (1) emotional tension, (2) physiological abnormalities, (3) mental abnormalities, (4) unresponsiveness in a lying or guilty subject, and (5) unobserved muscular movements which produce ambiguities or misleading indications in the blood pressure tracing. See also Commonwealth v. Fatalo, 346 Mass. 266, 191 N.E.2d 479 (1963).

And not to be overlooked as a potential source of error is the competency of the examiner. See Highleyman, The Deceptive Certainty of the "Lie Detector", 10

---

4. See, however, People v. Kenny, 167 Misc. 51, 3 N.Y.S.2d 348 (1938), which, at the time of the *Arnwine* decision, was where lie detector evidence was admitted in absence of a stipulation. It was possibly obliterated by People v. Forte, 279 N.Y. 204, 18 N.E.2d 31, 119 A.L.R. 1198, a decision of the New York Court of Appeals in the same year. See People v. Ford, 304 N.Y. 679, 682, 107 N.E.2d 595, 597 (1952).

Hastings L.J. 47, 51–61 (1958). Also, frequently mentioned is the supposed tendency of the trier of the facts to treat polygraph evidence as conclusive on the issue of the guilt of the accused, the lack of standardization of test procedures, and the difficulty for jury evaluation of examiners' opinions. See State v. Valdez, supra. See also "Don't Trust the Lie Detector," Harv.Bus. Rev. (1962), written by Sternbach, Gustafson, and Colier.

The courts have not been free from criticism for their reluctance to accept the results of lie-detector tests into evidence. See, i. e., Ferguson, Polygraphy v. Outdated Precedent, 35 Texas B.J. 531 (1972). And, in this state, efforts to license polygraph examiners and standardize procedures have been made. See Article 4413 (29cc), Vernon's Ann.Civ.St.

Only recently, two federal courts, after conducting extensive hearings on the present reliability of polygraph tests, found that such testing is now generally accepted by authorities in the field and is capable of producing highly probative evidence in a court of law when properly used by competent experienced examiners. United States v. Ridling, 350 F.Supp. 90 (U.S.D.C., E.D.Mich.S.D., Oct 6, 1972); United States v. Zeiger, 350 F.Supp. 685 (U.S.D.C., D.C., Oct. 10, 1972).[5] It is to be observed, however, that the *Zeiger* decision was reversed without opinion by the United States Court of Appeals, District of Columbia Circuit, 475 F.2d 1280 (Nov. 9, 1972), apparently rejecting the earlier holding that polygraph testing has emerged from the scientific "twilight zone."

While we are aware of efforts to promote the reliability of polygraph tests and of the claims that they are now more reliable than before, we are convinced at this time that we should adhere to the general rule of exclusion.

Despite the general rule of exclusion, there was a hint in some of the earlier cases that a stipulation or agreement would permit the introduction of the otherwise taboo evidence. See, i. e., State v. Arnwine, supra; Colbert v. Commonwealth, 306 S.W.2d 825, 71 A.L.R.2d 442 (Ky.App. 1957).

There is a split of authorities, however, among the various jurisdictions as to whether a valid stipulation will authorize the admission of the results of a polygraph test. While reaffirming the general rule of exclusion or inadmissibility, some jurisdictions permit the introduction of the results of such a test if there is a valid stipulation, with most providing some judicial safeguards. See State v. Valdez, supra; People v. Houser, 85 Cal.App.2d 686, 193 P.2d 937 (1948); People v. Davis, 270 Cal.App.2d 841, 76 Cal.Rptr. 242 (1969); State v. Brown, 177 So.2d 532 (Fla.App.2d 1965); State v. Freeland, 255 Iowa 1334, 125 N.W.2d 825 (1964); State v. Galloway, 167 N.W.2d 89 (Iowa Sup.1969); State v. Lowry, 163 Kan. 622, 185 P.2d 147 (Kan.Sup.1947). *Cf.* Orange v. Commonwealth, 191 Va. 423, 61 S.E.2d 267 (1950). See also State v. McNamara, 252 Iowa 19, 104 N.W.2d 568 (1960); State v. Fields, 434 S.W.2d 507 (Mo.Sup.1968); State v. Ross, 7 Wash.App. 62, 497 P.2d 1343 (1972); State v. McDavitt, 62 N.J. 36, 297 A.2d 849 (N.J.Sup.1972).

Other jurisdictions have found the results of such tests inadmissible despite the stipulation holding the waiver is not binding. See Le Fevre v. State, 242 Wis. 416, 8 N.W.2d 288 (1943); State v. Trimble, 68 N.M. 406, 362 P.2d 788 (1961); People v. Potts, 74 Ill.App.2d 301, 220 N.E.2d 251 (1966); People v. Zazzetta, 27 Ill.2d 302, 189 N.E.2d 260 (1963) and Pulakis v. State, supra.

---

5. See also People v. Cutler, 12 Cr.L.R. 2133 (Nov. 6, 1972), where a California Superior Court held admissible expert defense testimony about the favorable results of a polygraph test regarding the conflict between the defendant's and the police officer's testimony concerning the defendant's consent to search in question.

In those cases sanctioning the use of stipulation, the courts appear to rely upon the proposition that the parties to the cause are permitted to stipulate evidence, even inadmissible evidence, upon the theory of waiver. In State v. Fields, 434 S.W.2d 507, 513 (Mo.Sup.1968), the court said:

". . . It would be almost unthinkable to permit defendant now to reverse his position and oppose the reception of this evidence for the sole reason that the results were not favorable to him. . . ."

In State v. McNamara, 252 Iowa 19, 104 N.W.2d 568 (1960), the court wrote:

". . . In view of her agreement made with the approval of her able attorney she should not now be permitted to retract her agreement because the test proved unfavorable to her." 104 N.W.2d at 574.

Most cases go further and recognize that while much remains to be done to perfect the polygraph test, it has developed into a state in which its results are probative enough to warrant admissibility upon stipulation subject, however, to certain qualifications. In State v. Valdez, supra, the Arizona Supreme Court held that "qualifications" included (1) a written stipulation between the defendant and his attorney and the prosecuting attorney providing for submission to the test and the subsequent admission of graphs and examiner's opinion at the trial on behalf of either defendant or the state; (2) that notwithstanding the stipulation the admissibility of the results of the test are subject to the discretion of the trial court; (3) that if graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross examine the examiner respecting

(a) the examiner's qualifications and training;

(b) the conditions under which the test was administered;

(c) the limitations of and possibilities for error in technique of polygraphic interrogation; and

(d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) that if such evidence is admitted, the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which the defendant is charged but at most tends only to indicate that at the time of the examination the defendant was not telling the truth, and for the jury to be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.

These "qualifications" from *Valdez* were adopted by the Washington Court of Appeals, Div. 3, in State v. Ross, 7 Wash. App. 62, 497 P.2d 1343 (1972).[6]

Similar qualifications were required in Sate v. McDavitt, 62 N.J. 36, 297 A.2d 849 (1972), by the New Jersey Supreme Court. There the court required that the stipulation be clear, unequivocal and complete, freely entered into with full knowledge of the right to refuse the test and the consequences involved in taking it. It must further appear that the examiner is qualified and the test administered in accordance with established polygraph techniques. Further, the jury must be instructed that such evidence is not direct proof of a defendant's guilt or innocence of the crime charged, but is opinion evidence which tends only to indicate whether or not the subject was telling the truth when tested, and that it is for the jury to decide what weight and effect such evidence should be given.

Those courts refusing to sanction the use of stipulations appear to do so upon the

6. For an exhaustive agreement or stipulation reflecting warnings, i. e., right to silence, and waiver of constitutional rights, see footnote #1 of the *Ross* decision.

basis that if the polygraph tests are as unpredictable and misleading as the courts are so certain they are, then their reliability and usefulness to the court and jury remain the same, regardless of whether they are admitted by stipulation or not.

In Le Fevre v. State, 242 Wis. 416, 8 N. W.2d 288 (1943), there was a stipulation, but the Wisconsin Supreme Court simply held that the results of a lie-detector test offered by the defendant were not admissible, citing State v. Bohner, 210 Wis. 651, 246 N.W. 314 (1933). There was no discussion of the effect of the stipulation.

In State v. Trimble, 68 N.M. 406, 362 P. 2d 788 (1961), the New Mexico Supreme Court held that the fact that the defendant had signed a waiver did not alter the rule regarding admissibility of the results of lie-detector tests.

Further, in Conley v. Commonwealth, 382 S.W.2d 865 (Ky.App.1964), the Kentucky Court of Appeals wrote:

".  .  . Furthermore, since we are holding lie-detector results inadmissible, the written agreement that such might be introduced was not binding." 382 S.W. 2d at 867.

In Stone v. Earp, 331 Mich. 606, 50 N. W.2d 172 (1951) (a civil case in which results of a lie-detector test were rejected), the court said:

"We are not unmindful of the fact that at the direction of the trial court, the parties agreed to submit to the tests, but whether by voluntary agreement, court direction, or coercion, the results of such tests do not attain the stature of competent evidence.  .  .  ." 50 N. W.2d at 174.

In People v. Zazzetta, 27 Ill.2d 302, 189 N.E.2d 260 (1963), the Supreme Court of Illinois said:

".  .  . While a defendant may understandingly stipulate to much in a criminal trial, and may waive many objections, we think it manifestly unfair

to bind him by a stipulation regarding the trustworthiness of scientific opinion far beyond his expected ken.  .  .  ."

These cases take the position that it is inconsistent for a court to affirm the unreliability of lie-detector tests and at the same time admit into evidence the results of a stipulated test.

In Pulakis v. State, 476 P.2d 474, 479 (Alaska Sup.1970), the court, after reviewing numerous authorities, wrote:

"On the basis of our study of the judicial authority and academic literature in this area, we conclude that the results of polygraph examinations should not be received in evidence over objection. Even if no objection has been tendered, the trial court ordinarily should reject such evidence. *A stipulation for admission does not increase the reliability of polygraph results and therefore should not lead to any deviation from the exclusionary policy.*" (Emphasis mine.)

In the instant case, we conclude as did the Alaska Supreme Court in *Pulakis* that, based on our study, the results of polygraph tests should not be received into evidence, over objection, even if there had been a prior agreement or stipulation. Such stipulation does nothing to enhance the reliability of such evidence when offered by either side on the issue of the guilt or innocence of the accused.

The State in its brief relies upon State v. Valdez, supra, contending that most of the "qualifications" required there were required here as well. The State does acknowledge, however, that one of the qualifications was missing—that the trial court did not instruct the jury that such evidence is not direct evidence of guilt or innocence but evidence which tends only to indicate whether or not the subject was telling the truth when tested, etc. See, also, State v. McDavitt, supra.

In view of our holding, we need not decide whether the stipulation entered was a valid one or what qualifications are essen-

tial, or whether the privilege against self-incrimination was involved, etc. We do note that while the appellant was represented by counsel, there was no showing that appellant was warned of his right to refuse such test, etc., or any express waiver of his constitutional rights. In view of the previous holdings of this court and the fact that it was undisputed that appellant had taken drugs a few hours earlier, the fact that the examiner was only an intern at the time, and that there was a claim of misrepresentation involved, the stipulation should certainly have been suspect to the trial court.

In the event of a re-trial, every effort should be made to prevent the appellant from appearing in the presence of the jury in handcuffs. If, for security reasons, handcuffs or shackles are necessary, the trial judge should have the record clearly reflect the reasons therefor. See Ex parte Slaton, 484 S.W.2d 102 (Tex.Cr.App.1972).

For the reasons stated, the judgment is reversed and the cause remanded.