Silvestre FERNANDEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 54598.

Court of Criminal Appeals of Texas, Panel No. 3.

April 26, 1978.

Dick Stengel, El Paso, for appellant.

Steve W. Simmons, Dist. Atty. and Thomas C. Roepke, Asst. Dist. Atty., El Paso, for the State.

Before ROBERTS, ODOM and TOM G. DAVIS, JJ.

OPINION

TOM G. DAVIS, Judge.

Appeal is taken from conviction for two separate counts of aggravated robbery. Punishment was assessed by the jury at 12 years for the first count and 14 years for the second count.[1]

Appellant challenges the sufficiency of the evidence to support each of the convictions. Specifically, appellant contends that "the proof and evidence offered by the State . . . is insufficient to support the conviction" and that "in view of the testimony of Appellant and other defense witnesses, the State has failed to meet their burden of proof."

In *Banks v. State*, Tex.Cr.App., 510 S.W.2d 592, this Court set down the standard for reviewing the sufficiency of the evidence:

"In reviewing the sufficiency of the evidence to support the conviction, we must view the evidence in the light most favorable to the verdict. In doing so, the verdict will be sustained if there is any evidence which, if believed, shows the guilt of the accused."

See also: *Valore v. State*, Tex.Cr.App., 545 S.W.2d 477; *Clark v. State*, Tex.Cr.App., 543 S.W.2d 125; *Esquivel v. State*, Tex.Cr. App., 506 S.W.2d 613; *Resendez v. State*, Tex.Cr.App., 495 S.W.2d 934; *White v.*

---

1. The two counts involved separate robberies occurring at two different convenience stores within an hour's time. The counts were joined in a single indictment under the authority of V.T.C.A. Penal Code, Sec. 3.02. The sentences will run concurrently since the two counts were tried together. V.T.C.A. Penal Code, Sec. 3.03.

*State,* Tex.Cr.App., 478 S.W.2d 506; *Pogue v. State,* Tex.Cr.App., 474 S.W.2d 492.

The first count of the indictment alleged the armed robbery of Francisco Armando Ramirez, who was a clerk at the Circle K store at 6203 Airport in El Paso. Ramirez testified that at about 9:30 p. m. on February 9, 1975, the appellant entered the store, got a six-pack of beer from the cooler, and brought it to the check-out stand. After Ramirez had rung up the purchase, the appellant "produced a small pistol and asked me for the money from that first register . . . ." The appellant spoke to Ramirez in Spanish. Appellant then asked for the money "from underneath the tray," and Ramirez replied there was nothing there. Appellant then directed Ramirez to a second cash register. Ramirez testified that the second register was equipped so that when certain bills were removed an alarm was triggered. Ramirez gave these bills to the appellant. Appellant then demanded money from underneath the tray, and Ramirez lifted the tray to show him there was nothing there. Appellant finally demanded the money in the safe. Ramirez gave him a "dummy bag which is full of papers" from the safe. Appellant then left the store, telling Ramirez "not to look." Ramirez testified that about $35 was taken.

Ramirez testified that he was certain the man who robbed him was the appellant. Ramirez made an in-court identification of the appellant. He further testified that he had been shown two "photo lineups." In the first one he identified a seven-year-old picture of appellant as a "younger version" of his assailant. The second photo lineup contained a current picture of appellant, and Ramirez positively identified him. The record also indicates that Ramirez viewed an actual lineup, and again identified the appellant.[2]

The second count of the indictment alleged the armed robbery of Fabian Lozano, who was a clerk at the Jimbo's store located at Dyer and Thomason Streets in El Paso. Lozano testified that between 10:00 and 10:15 p. m. on February 9, 1975, the appel-lant entered the store and went to the beer cooler. Appellant took a six-pack of beer and went to the check-out stand. As Lozano started to ring up the purchase, appellant displayed a small .22 caliber automatic pistol and told Lozano to "give me the money." Lozano put the money from the register in a paper sack. Appellant then made Lozano lift the tray to see that there was no money under it. Appellant then asked if there was a safe in the back room and Lozano replied that there was not. Appellant finally asked if there were any more money under the counter. Lozano replied that there was not even though in fact there was. At this point, Lozano testified that the appellant "got a little angry and kind of moved his gun and started shaking." Lozano started to give him the money below the counter, but before he could do so, the appellant left the store. Lozano immediately called the police, and before he had finished the call a police car arrived. Lozano testified that appellant took at least $265.

Lozano made a positive in-court identification of the appellant. Lozano was shown two photo lineups, and both times he positively identified pictures of the appellant. Lozano was also shown an actual lineup and identified the appellant. No objection was voiced to this testimony.

The State further presented the testimony of Officer Duane Mackelroy of the El Paso Police Department. Mackelroy testified that on the night of February 9, 1975, he and his partner were driving by the Jimbo's at Thomason and Dyer. As they drove by, Mackelroy "looked inside the Jimbo's and I saw a Mexican male standing in there with dark glasses." Mackelroy saw the clerk in the store "lifting up the box out of the cash register." The policemen turned around and returned to the store "within a minute" of the time they had seen the above events. They proceeded to search for the robber but were unable to find him. Mackelroy made an in-court identification of the appellant as the man

2. The lineup and photo identification testimony was introduced without objection.

he had seen standing at the counter of the store.

In his brief, the appellant refers us to the testimony of several defense witnesses who testified to an alibi for the appellant. All of the testimony mentioned was before the jury for their consideration. It was within the province of the jury to accept or reject any or all of the testimony from witnesses for either the appellant or the State. In the instant case the jury sought to reject the alibi witnesses' testimony as they had a right to do.

We hold that the evidence set forth above is sufficient to sustain the two convictions.

Appellant next complains that "the trial court erred in not allowing evidence of the lie detector test which revealed appellant did not commit the charged offenses."

The appellant's bill of exception reflects that he requested to take a polygraph examination. The State agreed to allow the test, but only if appellant would first agree to be examined by a psychiatrist to see if he was a "good subject" for a polygraph. Appellant was examined by Dr. Ben Hill Passmore, a licensed psychiatrist, who found "no reason why a polygraph test would not be valid." The polygraph examination was administered by Reilly W. Taitte, Jr. Based on the polygraph examination, Taitte gave his opinion that "the subject did not commit either of the two alleged robberies on the date in question." The trial court excluded all such evidence.

■ It is a very well established rule that results of polygraph examinations are inadmissible for all purposes. *King v. State,* Tex.Cr.App., 511 S.W.2d 32; *Romero v. State,* Tex.Cr.App., 493 S.W.2d 206; *Humphrey v. State,* Tex.Cr.App., 479 S.W.2d 51; *Lee v. State,* Tex.Cr.App., 455 S.W.2d 316; *Hart v. State,* Tex.Cr.App., 447 S.W.2d 944; *Watkins v. State,* Tex.Cr.App., 438 S.W.2d 819; *Wall v. State,* Tex.Cr.App., 417 S.W.2d 59; *Placker v. State,* 171 Tex.Cr.R. 406, 350 S.W.2d 546.

■ Appellant contends this general rule should not apply when there is evidence that the State "agreed, stipulated, participated, encouraged, aided [or] abetted" in the test.

We first note that there is no evidence that the State did anything but allow the test to take place. When the appellant offered this contention to the trial court, the attorney for the State replied:

"... for the purpose of the record, only we would like to make it clear that the State's attorney consented to the test being conducted but there was [sic] no other agreements nor arrangements ... other than consenting to the test being conducted."

Even if there had been a formal agreement, the testimony would not have been admissible. In *Romero v. State,* Tex.Cr. App., 493 S.W.2d 206, the defendant, his attorney, and the attorney for the State all agreed in writing before hand that the results of a polygraph examination would be admissible. This Court held:

"... the results of polygraph tests should not be received into evidence, over objection, even if there had been a prior agreement or stipulation. Such a stipulation does nothing to enhance the reliability of such evidence when offered *by either side* on the issue of the guilt or innocence of the accused." [Emphasis added.]

See also *Robinson v. State,* Tex.Cr.App., 550 S.W.2d 54; *Lewis v. State,* Tex.Cr.App., 500 S.W.2d 167. The trial court properly excluded the polygraph testimony.

The judgment is affirmed.

ROBERTS, Judge, concurring in part and dissenting in part.

I agree with the Panel's conclusion that the record does not reflect that the State agreed or stipulated with the appellant that the results of the polygraph examination would be admissible if the appellant would first agree to be examined by a psychiatrist. However, had the State entered into such an agreement or stipulation, I cannot but conclude that evidence of the results of the polygraph would have been admissible. Moreover, I would go even further and

conclude that regardless of the presence or absence of a stipulation, evidence of polygraph results should be admissible in the courts of this State. However, due to the facts of this case, I conclude that the trial judge's improper exclusion of defensive evidence was harmless beyond a reasonable doubt.

We have consistently held that evidence of the results of lie detectors or polygraphs is not admissible on behalf of either the State or the defendant. *Robinson v. State,* 550 S.W.2d 54 (Tex.Cr.App.1977); *King v. State,* 511 S.W.2d 32 (Tex.Cr.App.1974); *Lewis v. State,* 500 S.W.2d 167 (Tex.Cr.App. 1973); *Romero v. State,* 493 S.W.2d 206 (Tex.Cr.App.1973). This is in accord with the near unanimous view of the courts of this country that the results of a polygraph are not admissible. However, as noted in *Romero v. State,* supra at 211, there is a decided split among the courts as to whether a *valid stipulation* will authorize the admission of the results of a polygraph examination. See also *State v. Chambers,* 240 Ga. 76, 239 S.E.2d 324 (1977).

In *State v. Chambers,* supra, 239 S.E.2d at 325, the Georgia Supreme Court stated:

"We acknowledge that doubt exists as to the complete reliability of lie detector tests, and we share at least a modicum of that doubt. Operators may be unskilled, and results may be ambiguous and subject to arbitrary characterization. Of course, by cross examination counsel may show any vagueness of the electronic indications or any subjectiveness of the examiner's interpretations, as well as exploring conditions other than the subject's untruthfulness which could have produced such responses.

"However, despite some problems posed by polygraphs, McCormick warned more than 20 years ago that 'We cannot in our hearts be so confident of the reliability of the present system of resolving conflicts in testimony by impeachment, cross-examination and inferences from demeanor, that we can afford to reject scientific aid in the task.' McCormick, Evidence, Sec. 174 (1954 Ed.). A more

recent writer has phrased this thought in more urgent language: 'If the judicial system is to fulfill its duty of searching for truth and maintaining integrity, it must commence a war against perjury. The war cannot be won with weapons restricted to cross-examination, inferences from demeanor, and other relics from the crossbow era of Henry II. * * * There is no tenable reason why qualified polygraphers should not be welcomed by courts confronting credibility questions; clearly, polygraphy "appears to have something valuable to add to the administration of justice." ' Tarlow, admissibility of Polygraph Evidence in 1975, 26 Hastings L.J. 917, 920–921 (1975). (Footnotes omitted)."

I unequivocally agree with the foregoing, but I cannot restrict my belief that evidence of the results of polygraph examinations is admissible to those situations where both parties have stipulated to the admissibility of such evidence.

Indeed, the current Texas view is completely devoid of logic. Article 37.071, Vernon's Ann.C.C.P., provides for the procedure in capital cases in Texas. Article 37.-071(b) sets forth three essential questions for the jury to answer. The death penalty is imposed only when a jury unanimously answers all three questions in the affirmative. The second question—Article 37.-071(b)(2)—requires a jury to ascertain "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." In *Collins v. State,* 548 S.W.2d 368 (Tex.Cr.App.1976), we held that testimony by psychiatrists whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society was permissible. See also *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976). Thus, we there sanctioned testimony by "doctors of the mind" addressing the probability of *future acts* of violence by a defendant. In *Smith v. Estelle,* 445 F.Supp. 647 (N.D.Tex.1977), Judge Porter stated:

"Even a cursory review of the psychiatric literature reveals that psychiatrists differ widely in their diagnosis of the same patients. The testimony of psychiatric experts is receiving increased judicial scrutiny because of its unreliable and invalid nature. *See United States ex rel. Wax v. Pate*, 298 F.Supp. 164 (N.D.Ill. 1967), *affirmed* 409 F.2d 498 (7th Cir.), *cert. denied*, 396 U.S. 830, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969). *Cf. Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

"This judicial scrutiny reflects skepticism among experts in the field itself. In 1969 Professor Dershowitz reviewed studies on the predictions of anti-social conduct and concluded:

'. . . that psychiatrists are rather inaccurate predictors—inaccurate in an absolute sense and even less accurate when compared with other professionals, such as psychologists, social workers and correctional officials and when compared to actuarial devices, such as prediction or experience tables. Even more significant for legal purposes, it seems that psychiatrists are particularly prone to one type of error—over prediction. They tend to predict anti-social conduct in many instances where it would not, in fact, occur. Indeed, our research suggests that for every correct psychiatric prediction of violence, there are numerous erroneous predictions. That is, among every group of inmates presently confined on the basis of psychiatric predictions of violence, there are only a few who would, and many more who would not, actually engage in such conduct if released.'

Dershowitz, The Psychiatrist's Power in Civil Commitment: A Knife That Cuts Both ways, Psychology Today, Feb. 1969, at 47.

"Recent studies support Professor Dershowitz's conclusions: 'perhaps the most striking evidence supporting Dershowitz's conclusions comes from the study of the results of "Operation Baxstrom" involving 969 prisoner-patients in New York State who were affected by the Supreme Court's decision in *Baxstrom v. Herold* [383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)]. The Court held that those persons remaining in Department of Corrections Hospitals after their prison terms had expired must be released, and committed civilly, if at all. Each of the 969 patients had been detained in maximum-security hospitals because psychiatrists determined that they were mentally ill and too dangerous for release or even for transfer to civil hospitals. Nevertheless, one year after the patients were transferred to civil hospitals, 147 had been discharged to the community and the 702 who remained were found to present no special problems to the hospital staff. Only seven patients were found to be so difficult to manage or so dangerous as to require recommitment to a Department of Corrections hospital. Several years later, 27% of the patients were living in the community, only nine had been convicted of a crime (only two of felonies), and only 3% were in a correctional facility or hospital for the criminally insane.

'Another recent study, described by one observer as the "most extensive study to date on the prediction . . . of dangerousness in criminal offenders" confirms the lesson of *Baxstrom*. A team of at least five mental health professionals, including two or more psychiatrists, was asked to conduct unusually thoroughly clinical examinations of individuals who had been convicted previously of serious assaultive crimes (often sexual in nature), assigned to special treatment programs after conviction, and who were then eligible for release. Based upon the examinations, extensive case histories, and the results of psychological tests, the team attempted to predict which individuals again would commit assaultive crimes if released. These predictions of dangerousness were made prior to the court hearings at which the ultimate release decisions were made. Of 49 patients considered by the evaluating team to be dangerous and therefore not recommended

for release, but who nevertheless were released after a court hearing, 65% had not been found to have committed a violent crime within five years of returning to the community. *In other words, ⅔rds of those released despite predictions of dangerousness by the professional team did not in fact turn out to be dangerous.'* Ennis & Litwack, Psychiatry and the Presumptions of Expertise: Flipping Coins in the Courtroom, 62 Cal.L.Rev. 693, 712–13 (1974). (Footnotes omitted) (emphasis supplied.)" [Footnotes omitted in original]

I fail to understand how expert testimony relating to what a defendant may or may not do in the future and an opinion whether the defendant would constitute a continuing threat to society is any more reliable than testimony relating to the physical reactions of a defendant in response to questions and the opinion that those physical reactions are consistent or inconsistent with whether the defendant lied during his responses. To me, any conclusion that the former is less innocuous than the latter to a defendant's right to a fair trial is bottomed not on logic, but on an unwillingness to depart from the "judicially accepted majority view" and a misguided belief that polygraph testing must emerge from the scientific "twilight zone" before we see the mistake we have made and reverse ourselves. As Judge Douglas so artfully stated in *Perez v. State*, 537 S.W.2d 455 at 458 (Tex.Cr. App.1976) (Dissenting Opinion), "[a] past mistake on the part of the Court is not a justification for committing the same mistake again."

Due to the inherent unreliability of psychiatric testimony and its acceptability in the area of capital punishment, I cannot but conclude that evidence of the results of polygraph examinations should always be admissible. Just as Chief Justice Burger observed in *Thornton v. Corcoran*, 132 U.S. App.D.C. 232, 248, 407 F.2d 695, 711 (1969) (Dissenting Opinion), that cross-examination serves as the check on the process by which a psychiatrist reaches a conclusion, so too will cross-examination serve as the check on the process by which a polygraph examiner reaches a conclusion.

The trial judge should not have excluded the evidence. However, in light of the "positive" identifications of the appellant made by Ramirez and Lozano, both of which were unobjected to, I conclude *in this case* that the excluded evidence would have merely been cumulative of the appellant's alibi witnesses. Therefore, the exclusion of evidence *in this case* was harmless error.

For the foregoing reasons, I concur with the result reached by the Panel, but I dissent from that portion of the opinion which discusses the admissibility of the polygraph results.