In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00024-CR


______________________________




ADAN MAYSONET, A/K/A LUIS MANUEL RIVERA, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 188th Judicial District Court


Gregg County, Texas


Trial Court No. 27,708-A




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Justice Grant



O P I N I O N



 Adan Maysonet, a/k/a Luis Manuel Rivera, was convicted by a jury of possession of more
than five pounds but less than 2,000 pounds of marihuana after being stopped for speeding. He was
sentenced to fifteen years in a state correctional facility. No fine was assessed. 

 Maysonet contends the trial court erred in overruling his motion to suppress because the
evidence found was the product of an unreasonable search and seizure in violation of the Fourth
Amendment to the United States Constitution and Article I, § 9 of the Texas Constitution. U.S.
Const. amend. IV; Tex. Const. art. I, § 9. 

 Specifically, Maysonet asserts two points of error regarding the denial of his motion to
suppress: 1) the State failed to establish a sufficient predicate for admitting radar evidence and
consequently cannot show a reasonable suspicion for initially stopping Maysonet's vehicle, and 2)
the search of Maysonet's vehicle and evidence obtained resulted from an unreasonably long
detention. 

Fact Summary

 Maysonet was traveling on Interstate 20 in a rental vehicle when drug interdiction
Officer Robbie Benson stopped him for speeding.

 At the suppression hearing, Benson testified that his primary basis for stopping Maysonet was
a radar reading of seventy-four miles per hour in a seventy-mile-per-hour posted speed zone. (RR
V.1 at 18). Also, Benson believed the sports utility vehicle driven by Maysonet was an out-of-state
rental vehicle, which he testified indicated Maysonet was a possible drug courier. Shortly after the
stop, Benson became more suspicious of drug activity. He based his suspicion on several
"indicators." First, Maysonet was driving a rental vehicle that was neither registered in his name nor
that he was authorized to drive. Second, Maysonet told Benson he planned to stop and see friends
in Monroe, Louisiana. Benson, however, became suspicious because the vehicle was due back in
Philadelphia, Pennsylvania, the next day, which at a minimum was over twenty hours of driving time
away. Finally, Maysonet told Benson he worked at a 7-11 convenience store which, according to
Benson, did not conform to the $167 per day rental fee paid for the 2000 Ford Expedition. Benson
then performed a routine driver's license inspection, as well as a criminal history check. 
Approximately fifteen minutes after the initial stop, Benson asked Maysonet if he had any weapons
or narcotics in the vehicle, to which Maysonet responded: "No. Do you want to check?" Benson
said, "Do you mind?" He then instructed Maysonet to open the back door, at which point he
discovered marihuana in a tan "see through" plastic bag. 

Standard of Review

 The standard of review for the trial court's ruling on a motion to suppress is abuse of
discretion. Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999); Freeman v. State, 62
S.W.3d 883 (Tex. App.-Texarkana 2001, pet. ref'd). In a suppression hearing, the trial court is the
sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. 
The evidence should be viewed in the light most favorable to the trial court's ruling. State v. Ballard,
987 S.W.2d 889, 891 (Tex. Crim. App. 1999); Freeman, 62 S.W.3d at 886. We should afford
almost total deference to the trial court's determination of historical facts that the record supports,
especially when the fact-findings are based on an evaluation of the witnesses' credibility and
demeanor. State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Freeman, 62 S.W.3d at 886.

 We review the court's application of the law of search and seizure to those facts de novo. 
Ross, 32 S.W.3d at 856. Further, when the trial court does not file findings of fact, we should
assume that the trial court made implicit findings that support its ruling, so long as those implied
findings are supported by the record. Id. at 855. If the trial court's decision is correct on any theory
of law applicable to the case, we should affirm the decision. Id. at 855-56.

Radar Evidence

 Maysonet contends the State failed to establish a sufficient predicate for admitting the results
of the radar into evidence, under Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). 
Conversely, the State insists Masquelette v. State, 579 S.W.2d 478 (Tex. Crim. App. [Panel Op.]
1979), a case that predates Kelly, dispenses for all time with the requirement to establish the
underlying reliability of radar. 

 In Masquelette, the Texas Court of Criminal Appeals held the State was not required to offer
expert testimony about the underlying scientific basis of radar so long as the officer testifies he was
trained both to operate the radar set and test it for accuracy. Id. at 480. 

 Kelly requires the proponent of expert testimony or evidence based on a scientific theory to
show by clear and convincing evidence that the evidence is both reliable and relevant to assist the
jury (or judge) in its fact-finding duty. Kelly, 824 S.W.2d at 573. To be reliable, evidence derived
from a scientific theory must satisfy three criteria: 1) the underlying scientific theory must be valid;
2) the technique applying the theory must be valid; and 3) the technique must have been properly
applied on the occasion in question. Id. Under Tex. R. Evid. 702, the State has the burden of
proving all three criteria to the trial court, outside the presence of the jury, before the evidence may
be admitted. Id. In Hartman v. State, 946 S.W.2d 60 (Tex. Crim. App. 1997), the Texas Court of
Criminal Appeals made it clear the Kelly test applies to all evidence based on a scientific theory, not
just to evidence based on novel scientific theories. Id. at 63. 

 Maysonet asserts the State failed to prove the validity of the underlying scientific theory of
radar-the first criteria of Kelly. Maysonet relies on Ochoa v. State, 994 S.W.2d 283 (Tex. App.- El
Paso 1999, no pet.), an El Paso Court of Appeals case interpreting Kelly in context of radar evidence. 

 Ochoa involved an appeal from a speeding ticket. In Ochoa, the State offered no evidence
about the underlying theory of radar. Rather, it asserted that the standard articulated in Masquelette
still governed the admissibility of radar. The El Paso Court of Appeals rejected this argument and
concluded that: "although radar is a familiar concept, it is based on a scientific theory and therefore
subject to proof of reliability and relevance under Kelly." Id. at 284. The court found that Kelly was
not satisfied because the State offered no evidence to explain the theory underlying the radar
calculation. Id. 

 In the present case, Officer Benson testified that he has used radar equipment since 1990 and
had calibrated and tested his radar unit one day before he stopped Maysonet for speeding. Benson
acknowledged that the gun itself calculates the speed of the object based on a signal that "is reflected
and bounces back." Benson, however, could not explain radar's margin of error or the underlying
scientific theory of radar. Further, the State offered no other evidence to show the validity of
underlying scientific theory of radar or the technique applied. 

 The question we must decide is whether Kelly's three-part inquiry abrogates Masquelette's
standard for the admissibility of radar evidence. We think it does not. Masquelette was decided
before Kelly rejected the Frye v. United States, 293 F. 1013, 1014 (D.C. 1923), "general acceptance"
test as the sole criterion for determining the admissibility of scientific evidence. (1) Kelly, 824 S.W.2d
at 572. However, Kelly does not require us to abandon the principles on which the court decided
Masquelette. Although the court in Kelly held that the "general acceptance test" could no longer be
dispositive on the issue of the admissibility of scientific evidence, it found it was still relevant. 
Beard v. State, No. 0282-00, 2002 Tex. Crim. App. LEXIS 183, *6 n.6 (Tex. Crim. App. Sept. 15,
2002) (citing Kelly, 824 S.W.2d at 572-73). (2)

 Moreover, the Texas Court of Criminal Appeals held that the inquiry about the admissibility
of scientific evidence under Rule 702 is substantively identical to the inquiry mandated by the United
States Supreme Court in the federal system in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579
(1993). Jordan v. State, 928 S.W.2d 550, 554 (Tex. Crim. App. 1996). In Daubert, the United
States Supreme Court also emphasized that general acceptance within the relevant scientific
community is a factor that can bear on the inquiry. 509 U.S. at 594. (3) The Supreme Court stressed
that the reliability inquiry is "a flexible one." Id. at 595.

 When dealing with well-established scientific theory, Kelly's framework provides courts
flexibility to utilize past precedence and generally accepted principles of science to conclude its
theoretical validity as a matter of law. To strictly construe Kelly otherwise would place a significant
burden on judicial economy by requiring parties to bring to court experts in fields of science that no
reasonable person would challenge as valid. If gravity were at issue, must a physicist testify to
establish its underlying theory? We think not. Neither must a doctorate of particle physics explain
the underlying theory of radar in every case involving radar. This is the spirit of Masquelette. 

 Radar's scientific validity is well settled in both the relevant scientific community and in
Texas jurisprudence. In 1959 in Wilson v. State, 168 Tex. Crim. 439, 328 S.W.2d 311 (1959), the
Texas Court of Criminal Appeals first looked at the reliability of the underlying scientific theory of
radar. In Wilson, the court discussed several cases from other jurisdictions holding that the
underlying theory of radar was sound. The court also referenced in great detail journals discussing
specific scientific principles on which radar is based. See id. at 312-13 (discussing Doppler effect
and microwave frequency refraction). Although the court ultimately reversed the appellant's
conviction for speeding, it did so because the State failed to show that officers had properly operated
the radar equipment on the particular occasion, not because the underlying theory of radar was
unreliable. 

 Later, in Cromer v. State, 374 S.W.2d 884, 887 (Tex. Crim. App. 1964), the Texas Court of
Criminal Appeals, referring to Wilson, rejected the idea the State must call scientists to establish the
principles by which speed is measured in cases involving radar. 

 Finally, in 1979 the Texas Court of Criminal Appeals in Masquelette, 579 S.W.2d at 481,
pronounced once and for all that the State is not required to call an expert witness to establish the
underlying theory of radar. 

 Although Kelly modified the pre-existing scheme for determining the admissibility of
scientific evidence, it also provides flexibility to courts to apply both generally-accepted scientific
principles and previous legal determinations. 

 In light of society's widespread use of radar devices, and considering other courts' acceptance
of radar, we view the underlying scientific principles of radar as indisputable and valid as a matter
of law. 

 Our holding today, however, does not mean radar evidence must not undergo rigorous
scrutiny under both the second and third prongs of the Kelly test, only that the underlying scientific
theory of radar is valid. The State must still establish that officers applied a valid technique and that
it was correctly applied on the particular occasion in question. 

 In the present case, a trier of fact could have reasonably concluded that Officer Benson's
testimony was sufficient to satisfy the second and third prongs of Kelly. Therefore, the trial court
did not abuse its discretion when it admitted the radar evidence.

Reasonable Suspicion to Stop Maysonet

 Having found the radar evidence admissible, we conclude Benson had reasonable suspicion
to stop Maysonet.

 Circumstances short of probable cause to arrest may justify a temporary detention for the
purpose of investigation. Daniels v. State, 718 S.W.2d 702, 704-05 (Tex. Crim. App. 1986),
overruled on other grounds, Woods v. State, 956 S.W.2d 33 (Tex. Crim. App. 1997). To justify an
investigative detention, the officer must have sufficient articulable facts, which, based on his
experience and personal knowledge, and coupled with logical inferences from those facts, warrant
the intrusion on the detainee. Joseph v. State, 865 S.W.2d 100, 102 (Tex. App.-Corpus Christi
1993, pet. ref'd). 

 The radar reading provided Officer Benson with a factual basis to determine that Maysonet
was speeding. Derived from his past experiences with radar, Benson could have reasonably drawn
a logical inference that Maysonet was speeding, therefore warranting his initial stop. 

 The determination of the presence of reasonable suspicion is a factual one and is made by
considering the totality of the circumstances at the time of the stop. Loesch v. State, 958 S.W.2d
830, 832 (Tex. Crim. App. 1997). The trial court did not abuse its discretion by denying Maysonet's
motion to suppress based on lack of reasonable suspicion. We therefore overrule appellant's first
point of error.

Unreasonably Long Detention

 Maysonet next contends the search of the rental vehicle he was driving resulted from an
unreasonably long detention. Specifically, Maysonet contends that "[w]hatever the officer's
suspicions may have been, the far reaching questions he asked [Maysonet] went well beyond any
level of inquiry reasonably related to a stop for speeding."

 Terry v. Ohio, 392 U.S. 1 (1968), provides the framework for our inquiry into this traffic
stop. The question in Terry was whether it was always unreasonable for a peace officer to seize a
person and subject him or her to a limited search unless there was probable cause for an arrest. Id.
at 15. The Court held that even though a "stop" and "frisk" was a search and seizure under the
Fourth Amendment, such actions by peace officers could be reasonable. Id. at 16-17. The Court
adopted a two-part inquiry to determine the reasonableness of such an investigative detention: (1)
whether the officer's action was justified at its inception; and (2) whether it was reasonably related
in scope to the circumstances that justified the initial interference. Id. at 19-20.

 Under part one, "the police officer must be able to point to specific and articulable facts
which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 
Id. at 21. An objective standard is used to assess whether the intrusion was reasonable. The question
is whether the facts available to the officer at the moment of the seizure or search would cause a man
of reasonable caution to believe the action taken was appropriate. Id. at 21-22. An investigative
detention not based on reasonable suspicion is unreasonable and therefore violates the Fourth
Amendment. As outlined above, a fact-finder could reasonably find that Benson had reasonable
suspicion to stop Maysonet for speeding.

 The second part of the Terry inquiry deals with the scope of the detention. The United States
Supreme Court noted that an investigative detention "must, like any other search, be strictly
circumscribed by the exigencies which justify its initiation." Id. at 25-26. The scope of the search
must be limited because a search reasonable at its inception may violate the Fourth Amendment
because of its excessive intensity and scope. Id. at 18. An investigative detention must be temporary
and last no longer than is necessary to effectuate the purpose of the stop. Davis v. State, 947 S.W.2d
240, 244 (Tex. Crim. App. 1997); Freeman, 62 S.W.3d at 887. A detention that is not temporary
and reasonably related in scope to the circumstances that justified the interference is unreasonable
and violates the Fourth Amendment. Davis, 947 S.W.2d at 243.

 Maysonet essentially argues that Officer Benson's actions failed the second part of the Terry
inquiry because the scope of the detention went beyond the initial purpose of the stop and was
therefore unconstitutional. After stopping Maysonet, Benson approached the driver's side window
and asked to see his driver's license and the car rental agreement, which Maysonet produced. Next,
Benson questioned Maysonet about his travel plans and the vehicle's rental agreement. Thereafter,
Benson ran a routine inspection on Maysonet's license, as well as a criminal history check.

 Officer Benson stopped Maysonet to investigate the traffic violation. Once Benson concluded
the investigation for the traffic violation, he could no longer lawfully detain or question Maysonet
unless he had reasonable suspicion to believe another offense was being committed. See Freeman,
62 S.W.3d at 887. Maysonet contends that at no time did Benson develop reasonable suspicion that
would justify detaining him beyond the scope of the stop for speeding. We must therefore determine
the time Benson concluded the investigation of the traffic violation and when Benson first had
reasonable suspicion to believe another offense was being committed. 

 Maysonet contends the "far reaching questions" Benson asked "went well beyond any level
of inquiry reasonably related to a stop for speeding." In Freeman, we cited the United States
Supreme Court opinion in Michigan v. Summers, 452 U.S. 692, 701 n.12 (1981), which quoted
Professor W. LaFave's analysis on this point:

 It is clear that there are several investigative techniques which may be utilized
effectively in the course of a Terry-type stop. The most common is interrogation,
which may include both a request for identification and inquiry concerning the
suspicious conduct of the person detained. Sometimes the officer will communicate
with others, either police or private citizens, in an effort to verify the explanation
tendered or to confirm the identification or determine whether a person of that
identity is otherwise wanted. . . . There is no reason to conclude that any of the
investigative methods of the type just listed are inherently objectionable . . . . 


Freeman, 62 S.W.3d at 888 (quoting 3 W. Lafave, Search and Seizure § 9.2, pp. 36-37 (1978)
(footnotes omitted)).

 During the investigation, the officer had the right to ask to see the driver's license and
insurance papers, information on the ownership of the vehicle, the driver's destination, and the
purpose of the trip. United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993); Mohmed v. State,
977 S.W.2d 624, 628 (Tex. App.-Fort Worth 1998, no pet.). This was the scope of Officer Benson's
inquiry.

 According to Benson, it was during this initial questioning that he identified signs of drug
courier activity. He based his suspicions on several "indicators." First, Maysonet was an
unauthorized driver with an out-of-state rental vehicle. Benson's primary duty was working drug
interdiction, and rental vehicles eastbound from Dallas with out-of-state license plates such as this
one were the kind for which he looked. Second, it was nearly impossible for Maysonet to return the
rental vehicle on time. The vehicle was due back in Philadelphia, Pennsylvania, the next day, which
at a minimum was over twenty hours of driving time away. But according to Maysonet, he had at
least one more planned stop, in to see friends in Monroe, Louisiana. Benson testified that in his
experience, it is common for people to rent vehicles and either not return them or keep them until
they are forced to return them.

 Finally, Maysonet's employment at a 7-11 convenience store did not conform to the high
price of the rental vehicle. If, during the course of a valid investigative detention, the officer
develops a reasonable suspicion that the detainee was engaged in or soon would engage in criminal
activity, a continued detention is justified. See Davis, 947 S.W.2d at 245. These facts were
sufficient to give rise to a reasonable suspicion that Maysonet was engaged in criminal activity. The
continued detention, therefore, was justified. 

 Maysonet also contends the search of the rental vehicle was improper because it resulted
from an unreasonably long detention. While Maysonet has standing to challenge the constitutionality
of the seizure or detention of his own person, he lacks standing to challenge the search of the rental
vehicle. See Freeman, 62 S.W.3d at 889. Maysonet presents no argument on the issue of standing. 
A defendant may have standing to challenge the determinative reasonableness of the seizures
involved in his own detention and yet lack standing to challenge a search of the vehicle. Freeman,
62 S.W.3d at 889; see also 40 George E. Dix & Robert O. Dawson, Texas Practice: Criminal
Practice and Procedure § 4.52, at 203 (2d ed. 2001). That is what happened here. 

 An accused has standing under both the Fourth Amendment and Article I, § 9 to challenge
the admission of evidence obtained by a governmental intrusion only if he had a legitimate
expectation of privacy in the place invaded. Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim.
App. 1996) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)). The accused, because he has greater
access to the relevant evidence, has the burden of proving facts establishing a legitimate expectation
of privacy. Villarreal, 935 S.W.2d at 138. To carry this burden, the accused must normally prove: 
(a) that by his conduct, he exhibited an actual, subjective expectation of privacy, i.e., a genuine
intention to preserve something as private; and (b) that circumstances existed under which society
was prepared to recognize his subjective expectation as objectively reasonable. Id. (citing Smith v.
Maryland, 442 U.S. 735, 740 (1979)). 

 A defendant has standing to challenge the search of an automobile he or she does not own
if he or she has permission from the owner to drive the vehicle, or if he or she has permission from
some other person authorized to give such permission, or if he or she otherwise has a legal right to
use and control the vehicle. Nite v. State, 882 S.W.2d 587, 590-91 (Tex. App.-Houston [1st Dist.]
1994, no pet.) (defendant had standing to challenge search of the car registered to his wife in part
because of community property laws); Stine v. State, 787 S.W.2d 82, 85 (Tex. App.-Waco 1990, pet.
ref'd) (defendant who had authority to test drive vehicles left for repairs at a car repair shop had
standing to challenge the search of the car which he used to commit murder). 

 A person, however, driving a rental vehicle does not have standing to challenge a search of
the vehicle if driving the vehicle is prohibited by the vehicle rental agreement, even if he or she has
the permission of the person who rented the vehicle. See United States v. Boruff, 909 F.2d 111, 117
(5th Cir. 1990); Rovnak v. State, 990 S.W.2d 863, 871 (Tex. App.-Texarkana 1999, pet. ref'd)
(following Boruff). Contra United States v. Lee, 898 F.2d 1034, 1038 (5th Cir. 1990) (driver of the
rental truck, who had permission from the lessee but not the lessor, had standing to challenge the
search). Here, Maysonet was driving a rental vehicle, and he was not listed as a driver on the rental
agreement. Further, no one in the vehicle was a registered driver. No evidence was introduced to
show that Maysonet had any interest in or right to use the vehicle, nor is there even a bare assertion
that he had such a right. 

 Therefore, Maysonet failed to demonstrate he had a legitimate expectation of privacy in the
rental vehicle. Although Maysonet had standing to challenge the detention, which was
constitutionally reasonable, he lacked standing to challenge the search of the rental vehicle. For
these reasons, we overrule Maysonet's second point of error. 



 The judgment is affirmed.



 Ben Z. Grant

 Justice


Date Submitted: October 1, 2002

Date Decided: October 16, 2002


Publish
1. Although Frye was never explicitly adopted in Texas, the Texas Court of Criminal Appeals
used the "general acceptance" test on several occasions to review lower court decisions. See Zani
v. State, 758 S.W.2d 233 (Tex. Crim. App. 1988); Reed v. State, 644 S.W.2d 479 (Tex. Crim. App.
1983); Cain v. State, 549 S.W.2d 707 (Tex. Crim. App. 1977); Romero v. State, 493 S.W.2d 206
(Tex. Crim. App. 1973).
2. The Texas Court of Criminal Appeals in Kelly discussed several "factors" available to courts
to determine reliability of scientific evidence. They include, but are not limited to: 1) acceptance
by the relevant scientific community, 2) qualifications of the expert, 3) literature concerning the
technique, 4) the potential rate of error of the technique, 5) the availability of other experts to test
and evaluate the technique, 6) the clarity with which the underlying theory or technique can be
explained to the court, and 7) the experience and skill of the person applying the technique. Kelly,
824 S.W.2d at 573.
3. Other factors the Court cited were: 1) whether the theory or technique can be or has been
tested, 2) whether the theory or technique has been subjected to peer review or publication, and 3)
the known or potential rate of error.



" height="14" border="0">




                                                                Donald R. Ross
                                                                Justice

Date Submitted:      January 25, 2006
Date Decided:         January 27, 2006

Publish