David Allen CASTILLO aka David Montana Castillo, Appellant,

v.

The STATE of Texas, Appellee.

No. 69340.

Court of Criminal Appeals of Texas, En Banc.

Sept. 30, 1987.

Kyle B. Welch, McAllen, for appellant.

Rene Guerra, Dist. Atty. & Theodore C. Hake, Asst. Dist. Atty., Edinburg, Robert Huttash, State's Atty., Austin, for State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). The indictment alleged that appellant on or about July 14, 1983, caused the death of Clarencio Champion by stabbing him with a knife while in the course of committing and attempting to commit robbery. The jury returned a guilty verdict and answered affirmatively the two special issues submitted under Article 37.071(b), V.A.C.C.P. As a result, the mandatory death penalty was imposed as required by law.

Appellant presents ten points of error for review. He initially contends the evidence was insufficient to sustain his conviction and the trial court erred in overruling his motion for instructed verdict. He contends further the trial court erred in admitting his tennis shoes into evidence because they had been seized as the fruits of an illegal arrest, that the court erred in admitting an extraneous offense, erred in allowing a reputation witness to testify who was not qualified, erred in refusing to admit the results of a polygraph examination of another suspect, erred in denying his motion for reasonable expenses in excess of the statutory limit, erred in excusing for cause a prospective juror because of her views concerning the death penalty, and erred in denying a mistrial when it was discovered a State's witness at the guilt stage of the trial had not been sworn. And in two additional points the appellant contends the trial court erred in denying his motions to quash the indictment.

At the outset we shall consider his challenge to the sufficiency of the evidence.

Around 10 p.m. on July 14, 1983, Lucy Sonner, a Mercedes Police Department dispatcher, on her way to work, was flagged down by a man staggering along North Texas Avenue. She observed that his clothing was soaked with blood, that he had been stabbed and he had a cut on his forehead. He was in pain. The man told her he had been robbed at a liquor store, apparently across the street. The man was identified as Clarencio Champion, the deceased. A patrol unit soon arrived and the officers began administering first aid.

Sgt. Jaime Alaniz, who arrived on the scene with Officer Dennis Turley, observed that Champion had a large cut on his right arm, close to the wrist. From Champion Officer Alaniz learned that the assailant was wearing a dark colored T-shirt and blue jeans, had short hair, dark complexion and appeared to be 20 to 23 years old. Champion added that he had never seen his assailant before. On cross-examination Alaniz recalled Champion had said, "They robbed me." followed by "He robbed me." Officer Turley recalled that Champion had responded to Alaniz's question by stating "He robbed me. He stabbed me and he took some money."

Turley described the wound to Champion's right arm as starting at the top of the inside portion of the arm and then "went diagonally across to the other side. Both bones were exposed, as well as an artery." Turley pinched off the artery. The cut across the forehead "traveled down" the left side of Champion's head and stopped at the top of the right side of his lip. Turley saw two wounds in the abdomen near the navel, a wound in the throat near the larynx, the one across the face and the wound to the arm.

Turley was informed by an unidentified bystander that Champion was the manager or the "counter person" at the Party House Liquor Store on North Texas Avenue.

Rigoberto Salinas, owner of Salinas Supermarket near the liquor store, rode with Champion in the ambulance on the way to the hospital. Salinas testified that Champion did not give him a physical description of the assailant, but stated, "That's the first time that I ever seen him in my life."

According to the testimony of Odelia Champion, the deceased's wife, her husband returned home shortly after 9 p.m. on

July 14 for supper; that he left the house around 10 p.m. to go to the Conoco service station which he supervised. She stated it was his procedure to pick up receipts and money at night from the service station and go to the liquor store "to put them up." She related her husband at the hospital described his assailant as "a young boy, about 20, clean cut," "kind of thin" and told her about his height; that the assailant spoke broken Spanish and kept saying "Damos los dineros. I am going to kill you."

Willie Rocha, a Mercedes police officer, testified he was in the hospital room with Odelia Champion; that he recalled the deceased described his assailant as "approximately 22 years old, skinny, very skinny, and tall." When asked by Rocha how tall the assailant was the deceased responded, "Five-eight, between five-eight and five-nine." The deceased reported to Rocha that the assailant was "dark, but not very dark" and spoke "very funny Spanish"; that his assailant said "Dame el dinero, dame dinero, o te mato" meaning "Give me money or I will kill you." The deceased told Rocha he had seen the young man "possibly once before," but that he was not sure.

After several operations[1] Clarencio Champion died on July 20, 1983. According to his doctors he died of septic shock due to generalized peritonitis which set in after having received penetrating stab wounds to the abdomen. Dr. Ruben Santos, pathologist, performed the autopsy and also concluded the 59–year-old deceased "died from complications secondary to the stab wounds to his abdomen, and with a perforation to his stomach." Dr. Santos listed other complications such as bilateral bronchial pneumonia, sepsis, renal failure, all brought on by bacterial infection. He concluded the cause of death was "definitely" the stab wounds.

Adelina Anciso, an employee at the Conoco station, testified the station and the Party House Liquor Store were owned by the same individual, Rudy Garza. On July 14, 1983, she testified she worked at the Conoco station from 2 p.m. to 10 p.m. when according to procedure she closed the station, locked the door, opened the register and placed all the money, checks, credit card receipts, in a blue money bank bag and put it in a back room. She stated the money bag contained about $1,000.00 in cash when she gave it to the deceased Champion when he appeared at the station about 10:15 p.m. and that he "picked up the money and took it to the Party House." She testified that she was familiar with the deceased's routine. He would close the liquor store at 9 p.m., go home, and return to the Conoco station about 10:15 p.m. to pick up the money and take the money to the liquor store.

Sylvia Anciso worked as a bookkeeper for the Conoco station and was in that position on July 14, 1983. She testified that Rudy Garza owned both the service station and the liquor store, while the deceased managed the liquor store and supervised the Conoco station. She corroborated Adelina Anciso's testimony about the routine of the deceased at night about closing the liquor store, returning to pick up the "money" from the station and taking it to the liquor store. She stated he took the money in bank bags.

1. Dr. Gonzalo Caballero treated the deceased near midnight July 15 for a stab wound to the left side of his chest and the stab wounds in the abdomen. Both stomach wounds were "very, very deep and penetrating," to the point where the doctor could feel the intestines through the wounds. The peritoneal membrane which covers the stomach and the bowels was so damaged that surgery was immediately required. Dr. Chandra, an orthopedic surgeon, also had to operate on the deceased's right arm. Due to the rupture of the arteries and nerves there was a possibility that the deceased would lose his hand.

After the operation was completed an instrument count showed that a small clamp was missing. X-rays indicated that the clamp was still in the abdomen of the deceased. An incision was made to remove the clamp, at which time Dr. Caballero noticed a buildup of pus due to peritonitis. The small clamp did not contribute to this complication, in fact, the doctor testified it gave him a chance to observe the abdomen again and to further wash and clean it. The deceased had been given antibiotics since before the surgery to combat the infection and peritonitis.

Officer Turley testified that after the ambulance took the deceased from the scene he went to the liquor store to photograph the interior and exterior of the establishment. He observed that nearly the entire floor was covered with blood. He recognized two types of shoe prints, one a cowboy boot, the other a tennis shoe. The cash register had been dislodged from its stand and was teetered on the edge of the counter. In the back room Turley found another large pool of blood larger than any of the other pools of blood in the building. The bloody footprints showed the victim's boot prints pointed to the front of the store and the tennis shoe prints faced the opposite direction. The boot prints continued backward into the rear portion of the store. The tennis shoe prints "accompanied the boot prints all the way." The same shoe prints also led through the store and out the front door.

Luis Chacon, Mercedes Police Investigator, theorized that Champion was first stabbed near the front of the store based on the pools of blood there, and observing that the prints of the victim stepped backward, Chacon could not detect an offensive step toward the assailant. Chacon made a sketch of the tennis shoe print and learned that they were "Pro-Wings" sold only in blue. He determined that the assailant fled the store going north toward the back of the liquor store to Liberty Street.

Detective Narciso Vargas investigated the alleged offense. The appellant's name was mentioned the night of the offense by Officer Jorge (George) Castillo. Narciso learned that appellant was living with Pedro and Lucinda Garcia on July 14, 1983, but that he also stayed at his father's house from time to time. Vargas contacted Juan Castillo, the father, on August 2nd and obtained permission to search appellant's room. There he seized a pair of blue jeans and socks which appeared to have bloodstains on them.

On August 7, 1983, with the consent of Pedro and Lucinda Garcia, Vargas searched the room appellant had occupied at their home. Nothing was recovered. On August 8, 1983, Lucinda Garcia called

Detective Vargas reporting the discovery of a blue bloodstained T-shirt and two bank bags in a hallway closet. The money bags contained personal checks and receipts from the Conoco station located across the street from the liquor store.

Adelina Anciso identified some of the checks and credit card receipts as ones she received on July 14th at the Conoco station, and she identified the blue bank bag as the one she gave to the deceased on the night of July 14th and in which she placed the checks, cash, etc..

Lucinda Garcia testified that appellant would sleep at her house on a daily basis during July 1983, while also living with his father; that he slept at her apartment but changed his clothes at his father's house. She testified that on July 14th appellant was at the apartment until about 8 or 9 p.m. She did not recall what he was wearing at the time, but that appellant generally wore T-shirts and jeans or khaki pants. He returned to the apartment about 11:15 p.m. wearing no shirt, wearing camouflage pants and looking "kind of sweaty."

The day after the police searched appellant's room Lucinda revealed that in a hallway closet she discovered a bloody T-shirt and two money bags, a white one with blood on it inside the blue bag. She called the police. Prior to this, approximately two weeks after the alleged offense, she found a knife in appellant's room. It was a silver knife "kind of big, pretty sharp." She showed it to her husband, appellant and others who were present. Appellant gave her a "weird" look and put the knife in his pocket.

Pedro Garcia, age 26, husband of Lucinda, and first cousin of the appellant, testified that during the period in question the appellant lived with him and his wife and children because the appellant had difficulties with his father. The witness said he had known his cousin for about 12 years since he was small and they all lived in Chicago Heights, Illinois. Pedro Garcia related that he attended school in Chicago Heights through the eighth grade before returning to Mercedes when he was in high school, and that English was the normal

language around the house where he lived with his father. He believed that appellant, who lived with his mother and father, also went to school in Chicago Heights, that appellant had once lived in Ohio and came to Mercedes on visits. He understood that appellant went to school in Mercedes after coming there but dropped out.

The witness stated that the appellant usually wore casual clothes such as T-shirts, baggy pants and tennis shoes when he was around the Garcia apartment although the appellant also wore blue jeans. The witness could not recall what the appellant was wearing when he left the apartment about 7 p.m. on July 14th. He did recall that the appellant was wearing camouflage pants when he returned later in the evening and recalled what the appellant said. The record reflects:

"A. Well, I recall his first words as he came through the door.

"Q. What did he tell you?

"A. He said 'I did it.'

"Q. What did you ask him?

"A. I asked him what it was that he had done.

"Q. What did he tell you?

"A. He said 'Never mind. You'll find out.'"

Pedro Garcia admitted that some time after the night of July 14th the appellant gave him $200.00 in cash.

He related that he consented to the police search on August 7th of appellant's room in the apartment, and that a few hours later while looking in the hall closet for a tape measure he found the bloody T-shirt and the bank money bags, that the white bag was inside the blue bag and contained some checks but no currency. He did not report any discovery to anyone stating, "I really don't have much of an answer for that, just that I took into consideration my cousin." He stated that his wife discovered the items the next day and called the police and noted, "I'm glad that it was my wife who turned them in."

Pedro Garcia revealed that some time before the trial and before the incident he had worked at the Conoco station in question for about six or eight weekends, that he knew the deceased, who helped him with the register, etc., and that on occasion he had given the money bags to the deceased, and he knew the deceased's routine. He stated the only difficulty he had was with the owner of the station, Rudy Garza, who asked him to leave his job unless he cleared himself of some charges made against him by the police. He denied giving the appellant any information about the station or liquor store and denied participating in the alleged offense.

Sylvia Anciso, the bookkeeper, also testified Pedro Garcia was employed at the station from May until July 1982 and that she and the deceased Champion had trained him for the job, and she did not know the exact circumstances under which he left his employment.

Catarina Garcia testified she had only known the appellant about two years "because he was not living here." He had visited her home in Mercedes on several occasions. His last visit was about 10:45 p.m. on July 14, 1983. When she went to the door she recalled that he was sweating and breathing very hard. He asked to talk to her granddaughter, Linda May Garcia, about a watch. Catarina awakened her granddaughter, who gave her a watch to give to the appellant. Upon returning to the door, she heard water running outside and observed that appellant was at the outside water faucet. After giving him the watch, she permitted appellant to come inside and use her telephone. She stated that he wore no shirt at the time and army fatigue pants like "the government uses for the forest or in the woods." She testified that the police later came and removed her outside faucet and replaced it with another faucet.

Linda May Garcia recalled that appellant, her first cousin, came by her grandmother's house about 10:40 p.m. on July 14, 1983. She did not see him, but heard him and gave to her grandmother the watch appellant inquired about, one she had offered to buy but had not yet paid for. She heard appellant use the telephone, attempting to call his brother, John. The next day,

July 15th, about 6 p.m. Linda May was at her brother's (Pedro Garcia's) house and appellant was there. He kidded her about being sleepy the night before and stated he had been jogging and wanted to get a ride from her. She had given him rides in her car before. She concluded the watch matter was secondary, and understood he had lost the watch after he had gotten it.

A week or so later she was again at her brother's house. Pedro, Lucinda, her Uncle Oscar and appellant were there, and the men were talking about girls. She recalled that Lucinda got jealous and said, "You are going to get it, Pete"; that Lucinda went into the room where the appellant was staying and came out with a knife and everyone got quiet; that the appellant then asked, "What are you doing, snooping around?" and Lucinda responded, "No, I just saw this there on top of the closet." Linda May described the knife as silverish, about seven or eight inches long which looked like a pocket knife, but she couldn't be sure. At her grandmother's urging she had gone to the police sometime in August.

Jorge Castillo, Sheriff's investigator, had gone to the Party House Liquor Store on July 14th to assist the investigation in the instant offense. He was also present after appellant was arrested for a different offense on July 25th and his tennis shoes were taken from him. He stated the shoe prints of those shoes were very similar to the ones at the scene at the Party House. The shoes were submitted to the DPS laboratory on July 26th.

Raul Guajardo, a DPS chemist, determined that the deceased had type O blood. He analyzed the bloody clothing of the deceased and determined that it contained type O blood. Scrapings taken from the white money bag also contained type O blood, although it could not be concluded that the blood necessarily came from the deceased. Analysis of Catarina Garcia's faucet showed that it contained blood on two areas, although it could not be determined whether the blood was human or not. Guajardo testified that "the amount of blood present on that pipe was not sufficient to get any blood type or human determination, even if you could see the stain, barely." The blue, sleeveless T-shirt found in Lucinda Garcia's closet also contained type O blood. More conclusive was the fact that the blood found on the dark T-shirt had the same enzyme makeup as the deceased's blood. The blue jeans taken from the home of appellant's father did not contain bloodstains.

Blood was also detected on appellant's right tennis shoe. Guajardo measured appellant's tennis shoes with a ruler and discovered that the ridges or "ribs" on the soles were about half an inch apart. He compared the tread pattern on the shoes to the photograph of the shoe prints taken at the liquor store. The "wear patterns" were consistent with the prints depicted in the photographs. Guajardo admitted, however, that he was not qualified as an expert to make shoe print comparisons.

Reynaldo Garza, age 48, testified that on June 16, 1983, he worked as a cashier at the Valley View Drive-In, a convenience store, located between Alamo and Donna, in Hidalgo County, about 10 miles from Mercedes. He arrived at the store about 6:20 p.m. and put the money in the register. About 6:30 a.m. a young man, whom he identified as the appellant, drove up to the gas pumps and put the hose into the car and came into the store. He placed a dollar bill on the counter and then added 47 cents. When Garza turned to enter the amount in the machine at the counter the appellant reached over the counter and stabbed him in the left side, causing Garza to fall to the floor. Appellant then jumped over the counter and stabbed Garza in the face between the cheek bone and the jaw bone and asked, "Where is the money bag." When Garza replied he didn't have one, the appellant opened the register, jumped back over the counter and left. Garza noticed that appellant wore blue jeans and a white T-shirt, but did not observe his footwear. Garza was able to summon help and was taken to the hospital.

Approximately one month later Garza identified appellant out of a photographic

lineup. He also identified appellant in open court.

Appellant was arrested on July 25th for the aggravated robbery of Garza,[2] and after that arrest his tennis shoes were seized.

Investigator Castillo was recalled and testified about taking photographs found at the scene of the stabbing at the drive-in or convenience store. He found footprints embedded in blood at the scene and one had some very distinguishing patterns, a horizontal type print and impression with the pattern from side to side, and he observed the ridging. He believed the prints to be from tennis shoes and he saw the same pattern again in July "on that Mercedes case."

The appellant called Flavio Acosta, Jr., a Regional Police Academy instructor in Harlingen, who testified that the latent palm print lifted at the Party House Liquor Store matched known palm prints of Rodolfo Rodriguez Rodriguez, even though there were some dissimilarities and some pattern differences. He had no doubt that the latent palm prints belonged to Rodriguez.

The State had anticipated this testimony. In its case-in-chief the State had called Danny Carter, a latent fingerprint examiner for the Texas Department of Public Safety in Austin. He testified the known palm print of Rodriguez did not match the latent print lifted. Joe Bailey, fingerprint examiner with the McAllen Police Department, testified for the State he likewise found the prints did not match. He found three distinct differences in ridge detail and stated one difference will rule out a comparison print no matter how many similarities might be apparent.

Other evidence showed that Rodriguez was six feet tall, weighed about 170 to 180 pounds, spoke good Spanish, and was from Mexico, wore boots when arrested, and after he pleaded guilty to a robbery charge he had been given 10 years' probation, and permitted to return to Mexico.

Other evidence reflected that appellant was born on August 11, 1964, and was almost 19 years of age at the time of the alleged offense.

In addressing appellant's first point of error alleging that the evidence was insufficient to support a verdict of guilty, we note that the standard for review is the same for circumstantial as well as direct evidence cases. *Moreno v. State,* 721 S.W. 2d ·295, 300 (Tex.Cr.App.1986); *Fierro v. State,* 706 S.W.2d 310, 313 (Tex.Cr.App. 1986); *Brandley v. State,* 691 S.W.2d 699, 703 (Tex.Cr.App.1985); *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (Opinion on Rehearing); *Freeman v. State,* 654 S.W.2d 450 (Tex.Cr.App.1983); *Denby v. State,* 654 S.W.2d 457 (Tex.Cr.App.1983); *Houston v. State,* 663 S.W.2d 455 (Tex.Cr. App.1984). The standard adopted by this Court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 563 (1979); see also *Chambers v. State,* 711 S.W.2d 240, 245, n. 5 (Tex.Cr.App.1986); *Godsey v. State,* 719 S.W.2d 578, 582 (Tex.Cr.App. 1986); *Brown v. State,* 716 S.W.2d 939, 947 (Tex.Cr.App.1986); *Carlsen,* supra, at 448.

And where the case is a circumstantial evidence case, as is the instant one, it has been said:

"It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. (Citations omitted) Each fact need not point directly and independently to the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the evidence. (Citations omitted) However, proof which amounts only to a strong suspicion or mere probability is insufficient." *Carlsen,* supra, at 447; see also *Brandley,* supra, at 703–04.

---

**2.** On September 16, 1983, the appellant entered a plea of guilty to the aggravated robbery indictment and was sentenced to eight years' imprisonment.

"It is enough if the conclusion [of guilt] is warranted by the combined and cumulative force of all the incriminating circumstances." *Russell v. State*, 665 S.W.2d 771, 776 (Tex.Cr.App.1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984).

In reviewing the evidence in the light most favorable to the verdict, we are persuaded that the "combined and cumulative force of all the incriminating circumstances" is sufficient to support the jury's verdict.

The evidence shows that the deceased described his assailant as wearing a dark colored T-shirt and blue jeans, who spoke broken Spanish and appeared to be in his early twenties. The evidence shows there was a considerable amount of blood in the liquor store as a result of the stabbing. A short time after the alleged offense the evidence placed appellant at the home of Catarina Garcia breathing very hard, sweaty and not wearing a shirt. He was observed using the water faucet upon which blood was later found. Thereafter he was shown to have returned to the home of Pedro and Lucinda Garcia where he was staying. Upon his return appellant told Pedro "I did it." Later Lucinda found a large seven to eight inch knife in the closet of the room where appellant was staying. When it was shown to a group of people at the house appellant claimed it and asked Lucinda why she was "snooping around." Still later Lucinda found in the hallway closet a dark blue, bloodstained T-shirt along with two bank money bags. Blood was on the white bag. The blue T-shirt was shown to contain type O blood, as well as having the same enzyme makeup as the deceased's blood. The two money bags were identified as having been the two bags that the deceased picked up at the Conoco station shortly before he was attacked. One bag was shown to contain personal checks to the station, credit card receipts of July 14, 1983, placed in the bag shortly before the bag was given to the deceased. Missing was $1,000.00 in cash that had also been placed in the bag. Sometime after July 14th the almost 19-year-old appellant, who appears to have been unemployed, gave $200.00 in cash to Pedro Garcia.

Blood was also found on appellant's tennis shoe. The tread and wear patterns on the soles of appellant's tennis shoes were consistent with the blood prints of tennis shoes found at the liquor store. In testimony limited by the charge to the issue of identity Reynaldo Garza identified appellant as the man who stabbed him during a robbery at a convenience store on June 16, 1983, in which incident the appellant asked for a money bag. Officer Jorge Castillo observed that the bloody tennis shoe prints at the scene of the robbery of Garza matched the same pattern of bloody tennis shoe prints on the floor of the liquor store where the deceased in the instant case was stabbed.

It was further shown with regard to the "broken Spanish" description that appellant was raised and educated in Chicago, Illinois schools and that he had also lived in Ohio, and had been in the Mercedes area only a relatively short time before the alleged offense.

The appellant relies upon the conflict between the experts as to whether the palm print lifted from the liquor store counter was that of Rodolfo Rodriguez Rodriguez. Two expert witnesses stated it could not have been Rodriguez's, and it was further shown that Rodriguez spoke good Spanish. The conflicting testimony presented a fact issue for the jury which it resolved by its verdict. It was also shown that Pedro Garcia had been trained for his job at the Conoco station by the deceased, so he was not a person the deceased had ever seen before as the deceased had described his assailant.

Viewing the evidence in the light most favorable to the verdict, we conclude that the cumulative force of all the facts and circumstances is sufficient to allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. The point of error is overruled.

Another point of error claims the trial court erred in admitting evidence of the extraneous aggravated robbery of Reynaldo Garza committed on June 16, 1983, al-

most a month before the alleged offense on July 14, 1983. Appellant argues the primary similarities between the two offenses is that both involved robberies in which the victim was stabbed. He argues the prejudicial effect of admitting evidence of the extraneous offense outweighed any relevance. The State argues that this was a circumstantial evidence case and the extraneous offense was properly admitted on the question of identity, and that it was so limited to that issue in the court's charge.

It is the general rule that an accused may not be tried for some collateral offense or for being a criminal generally. *Cantrell v. State,* 731 S.W.2d 84 (1987); *Clark v. State,* 726 S.W.2d 120 (Tex.Cr. App.1986); *Boutwell v. State,* 719 S.W.2d 164 (Tex.Cr.App.1986) (Opinion on Rehearing); *Templin v. State,* 711 S.W.2d 30, 32 (Tex.Cr.App.1986); *Rubio v. State,* 607 S.W.2d 498, 499 (Tex.Cr.App.1980); *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Cr. App.1972). The two part test for admissibility of a collateral offense is as follows:

"First, it must be determined that the extraneous offense evidence is relevant to a material issue in the case other than the defendant's character. (Footnote omitted). Second, the evidence must possess probative value which outweighs its inflammatory or prejudicial effect." *Plante v. State,* 692 S.W.2d 487, 491 (Tex.Cr.App.1985); see also *Mann v. State,* 718 S.W.2d 741, 743 (Tex.Cr.App. 1986); *Clark,* supra, at 122; *Williams v. State,* 662 S.W.2d 344, 346 (Tex.Cr.App. 1983); *Murphy v. State,* 587 S.W.2d 718, 722 (Tex.Cr.App.1979).

■ Further, it should be remembered that even though evidence of another crime may be relevant to the instant proceeding, such evidence should not be admitted unless the commission of the other crime is clearly proved and the accused is shown to have been its perpetrator. See 24 Tex. Jur.3d, Criminal Law, § 3035, p. 180.

■ Every case must be examined on its own facts, strengths and weaknesses to determine whether the extraneous transaction is relevant to a material issue, and whether the relevancy value outweighs the prejudicial potential. See *Collazo v. State,* 623 S.W.2d 647, 648 (Tex.Cr.App.1981).

One recognized exception to the general rule against admitting evidence of extraneous offenses is where the evidence tends to connect and identify the accused with the particular offense charged. *Genzel v. State,* 415 S.W.2d 919 (Tex.Cr.App.1967); [3] *Ortega v. State,* 626 S.W.2d 746 (Tex.Cr. App.1981); 24 Tex.Jur.3d, Criminal Law, § 2027, pp. 186–187.

■ In discussing exceptions to the general rule *Williams v. State,* 662 S.W.2d 344 (Tex.Cr.App.1983), observed that extraneous offenses are admissible to circumstantially prove identity. *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Cr.App.1972), noted that "[E]vidence of extraneous offenses committed by the accused has been held admissible: (1) . . .; (2) *To circumstantially prove identity where the state lacks direct evidence on this issue.*" (Emphasis added.) And it has also been said that an extraneous offense is admissible on the question of identity if the extraneous offense has sufficient common distinguishing characteristics to show that it was the handiwork of the accused, *"and the State case is entirely circumstantial on the question of identity." Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983), cert. den. 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752, rehearing den. 466 U.S. 932, 104 S.Ct. 1720, 80 L.Ed.2d 192 (1984). See also *Siqueiros v. State,* 685 S.W.2d 68, 71 (Tex.Cr.App.1985). Before an extraneous offense may be admitted against an accused it must be shown that there is a relationship between such evidence and the evidence necessary to prove that the accused committed the crime for which he stands charged. *Siqueiros,* supra, at 71. This relationship should consist of some distinguishing characteristic common to both the extraneous offense and the offense charged. *Siqueiros,* supra, at 71. *Russell,* supra, at 778; *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App.1974).

**3.** Now see Texas Rules of Criminal Evidence, Rule 404(b), eff. Sept. 1, 1986.

First, we observe that the extraneous offense was clearly proven and the appellant was shown to be its perpetrator. The exception to the general rule discussed above came into play. And there are distinguishing characteristics common both to the offense charged and the extraneous offense beyond the primary similarities described by the appellant—that both involved robberies where the victim was stabbed. Although both offenses occurred in Hidalgo County approximately one month apart, the common distinguishing characteristic does not necessarily have to be in time or place. Instead, "the common element may be the mode of commission of the crimes, or the mode of dress of the perpetrator, or any other element which marks both crimes as having been committed by the same person." *Ford v. State*, 484 S.W.2d 727, 730 (Tex.Cr.App.1972) (footnote omitted.) In the instant case both the offense charged and the extrinsic offense involved robberies. The victims were old proprietors or employees of business establishments who were alone at the time in the store. The robbery in each was committed by use of a knife. In both cases, in addition to the severe body wounds inflicted, each victim was stabbed and cut in the face as if the assailant was leaving his brand or mark. In both cases money bags were either taken or demanded. The mode of the dress of the assailant in each case was a T-shirt and blue jeans and tennis shoes. In each case bloody tennis shoe prints were left in the blood of the victim on the floor. Bloody shoe prints were shown to match, and in each case the assailant fled after the brutal attack. The offenses were committed in the same county about a month apart.

We conclude that the court did not err in admitting the evidence of the extraneous offense under the tests described above.

In another point of error appellant contends the trial court erred in admitting his tennis shoes into evidence as the same were seized as a result of illegal arrest for another offense. He relies upon the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, Article I, § 9 of the Texas Constitution, and Article 38.23, V.A.C.C.P. It is his claim that the arrest warrant for aggravated robbery was based on an affidavit or complaint which failed to reflect probable cause.

At a hearing on appellant's motion to suppress it was shown that appellant was arrested in McAllen on July 25, 1983, by virtue of said warrant and taken to jail where his shoes were taken from him as he was being taken to a jail cell. The motion was overruled. The shoes were offered at trial on the capital murder over the same objection.

The affidavit or complaint for the arrest warrant in question was personally signed and sworn to by Reynaldo Garza, the robbery victim at the Valley View Drive-In, before the magistrate who issued the arrest warrant for aggravated robbery.

The affidavit stated that "on the 16 day of June A.D. 1983, in County of Hidalgo and State of Texas David Allen Castillo, hereinafter called Defendant, did then and there unlawfully while in the course of committing theft and with intent to obtain property of Reynaldo Garza, to wit: undetermined amount of U.S. currency without the effective consent of the said Reynaldo Garza and with intent to deprive the said Reynaldo Garza of said property, did then and there intentionally and knowingly cause serious bodily injury to Reynaldo Garza by stabbing him in the left rib cage and the right cheek and the nose, with a large sharp instrument...."

It is well established that an arrest warrant affidavit must provide the magistrate with sufficient information to support an independent judgment that probable cause exists to believe that the accused has committed a crime. *Ware v. State*, 724 S.W.2d 38, 40 (Tex.Cr.App.1986); see also *Reese v. State*, 712 S.W.2d 131, 133 (Tex.Cr.App. 1986); *Armstrong v. State*, 718 S.W.2d 686 (Tex.Cr.App.1985); *Jones v. State*, 568 S.W.2d 847, 854 (Tex.Cr.App.1978), cert. denied, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1979); *Frazier v. State*, 480 S.W.2d 375 (Tex.Cr.App.1972); *Whiteley v. Warden of Wyoming Penitentiary*, 401 U.S.

560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

"The information with which the magistrate may be supplied may be either the 'direct personal observations of the affiant,' *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), or hearsay information. *Aguilar v. Texas*, supra, *Jones v. United States*, supra." *Jones v. State*, 568 S.W.2d 847, 854 (Tex.Cr.App. 1978).

■ In the instant case the affiant was the victim of the offense and supplied the magistrate his personal observations. The affidavits for both arrest and search warrants are to be interpreted in a common sense and realistic manner, and the magistrate who reviews an affidavit may draw inferences from the facts contained in it. *Jones v. State*, supra, at 855; *Goodrich v. State*, 671 S.W.2d 920, 924 (Tex.App.— Houston [14th Dist.1984). See also *Frazier v. State*, 480 S.W.2d 375 (Tex.Cr.App. 1972).

We conclude that the affidavit for the arrest warrant reflected probable cause based on personal observations of the victim who swore to the affidavit. The appellant's point of error is overruled.[4]

It should be borne in mind that we are not dealing with an affidavit based on hearsay (where the affiant is other than the victim of the offense, most likely a police officer-affiant) and where we would be called upon to consider the "totality of the circumstances" test of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), as applied in *Hennessy v. State*, 660 S.W.2d 87, 90 (Tex.Cr.App.1983), or the effect of the *Aguilar-Spinelli* test. See *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The cases cited by appellant all involved affidavits based on hearsay information supplied by third parties failing to meet the *Aguilar-Spinelli*

test now discarded by *Illinois v. Gates*, supra.

Point of error four argues that Jorge Castillo should not have been allowed to testify at the penalty stage of the trial as a reputation witness because he was not qualified to give such testimony. Castillo, a Sheriff's investigator, who was a witness at the guilt stage of the trial, had his qualifications tested in a hearing outside the jury's presence, before being permitted to testify. At that hearing Castillo first testified he knew appellant's reputation for being a peaceful and law-abiding citizen and that it was bad. Appellant's counsel then inquired. It was established that Castillo had based his opinion on "talking to several people in the Mercedes area" "on several occasions" "within the last three or four years" who were "ordinary citizens" and not police officers. Castillo, formerly with the Mercedes Police Department, had "a couple of experiences" with appellant when he was a juvenile in Mercedes, and that while working with the Sheriff's office he knew of specific instances of misconduct although he didn't personally investigate them. Castillo revealed that he had talked to a police officer in Ohio about an assault that appellant supposedly committed against a police officer in that state while appellant was living there, and that he also heard about a shooting incident in Mercedes which he did not investigate. Castillo also stated he had investigated the instant case and the aggravated robbery of Rey Garza. The record then reflects:

"Q. You are talking about specific instances of misconduct. And on this, you say his reputation is bad?

"A. To me, it is.

"THE COURT: Reputation for what?

"REDIRECT EXAMINATION

"BY MR. GUERRA (Prosecutor)

---

4. We have long held that the standards used to judge the showing of probable cause are the same for arrest and search warrants. *Ware v.*

*State*, 724 S.W.2d 38, 40 (Tex.Cr.App.1986); *Evans v. State*, 530 S.W.2d 932, 935 (Tex.Cr.App. 1975).

"Q. For peaceable and law abiding. You say that his reputation is bad, based on those instances?

"A. Yes, sir."

Thereafter the court overruled the objection that the witness was not qualified. The jury was returned and the witness testified appellant's reputation for being a "peaceful" and law-abiding citizen was bad. There was no cross-examination.

Appellant maintains the testimony permitted before the jury cannot be considered harmless since Castillo was the only reputation witness for the State at the penalty hearing, and the death penalty was imposed. He does not challenge the sufficiency of the evidence as to the affirmative answers to the special issues.

Appellant relies heavily upon the fact that Castillo had investigated the instant offense and the aggravated robbery of Garza, and his answer to his concluding question on voir dire examination. Reliance upon the proposition that Castillo was basing his opinion *solely* on specific incidents of misconduct is misplaced and does not take into consideration all the testimony before the court before it ruled on qualification.

The requisites for admitting testimony from a reputation witness were discussed in *Mitchell v. State*, 524 S.W.2d 510 (Tex.Cr.App.1975).

"The two-prong qualification requirement consists of (1) testimony by the witness that he has discussed or heard of appellant's reputation with other people; and (2) the discussion cannot be based on the particular offense for which appellant is on trial, although it can be based upon the offense for which the defendant is on trial and a discussion of matters other than the instant offense. *Watson v. State*, 605 S.W.2d 877 (Tex.Cr.App. 1979) (opinion on rehearing 1980)."

■ In *Jackson v. State*, 628 S.W.2d 446, 450 (Tex.Cr.App.1982), it was pointed out that a reputation witness' testimony must be based on discussion with others concerning the defendant, or on hearing others discuss the defendant's reputation, and not just on personal knowledge. Discussions with other police officers are sufficient to qualify a witness on reputation, but reputation opinion must be based on facts or rumors other than the actions or offenses for which the defendant is being tried. However, general reputation testimony is admissible even though it is partially based on a discussion of the offense for which the defendant is being tried, if it also is based on a discussion of matters other than the instant offense. *Watson v. State*, 605 S.W. 2d 877 (Tex.Cr.App.1980); *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976).

■ Appellant relies upon *Wagner v. State*, 687 S.W.2d 303 (Tex.Cr.App.1984) (Opinion on Rehearing). There the police officer witness testified that appellant's reputation for being a peaceable and law-abiding citizen was bad. It was shown to be based solely upon one discussion with an individual about a terroristic threat and that nothing else was discussed. There it was stated:

"Rather, it reflected a single unproven allegation made by an obviously biased third party. Standing alone, knowledge of such a specific act will not qualify a witness to testify that he knows the reputation of an accused to be bad, and we so hold."

Under the circumstances presented, however, the error in admitting the evidence in *Wagner* was held to be harmless.

*Wagner* is clearly distinguishable from the instant case on its facts. Appellant's reliance is misplaced. Reading the voir dire examination as a whole, we cannot conclude the court erred in admitting the reputation testimony of Officer Castillo.

Still another of appellant's points of error claims the trial court erred in excluding the testimony of Jose Martinez concerning the results of a polygraph examination administered to Rodolfo Rodriguez Rodriguez, once a possible suspect in the case. Rodriguez was arrested on July 21, 1983 in connection with an unrelated aggravated robbery charge in McAllen. A palm print was lifted at the crime scene in the instant case. It was disputed as to whether it belonged to Rodriguez. Mercedes police

officers were called to McAllen to observe Rodriguez and a polygraph examination was administered to Rodriguez.

At trial the appellant sought to offer the testimony of Jose Martinez, former polygraph examiner for the McAllen Police Department, as to the results of the lie detector or polygraph examination. The trial court refused to permit such testimony. A bill of exception was perfected. Martinez would have testified that in his opinion the results showed Rodriguez was deceptive and indicated Rodriguez had knowledge of or involvement in the "Mercedes robbery" at the liquor store. Martinez related he had conveyed his findings to Mercedes Police Chief Nunley or other Mercedes officers.

 It has long been the consistent holding of this Court that evidence of the results of a lie detector or polygraph test is not admissible on behalf of either the State or the defendant. *Romero v. State,* 493 S.W.2d 206, 210 (Tex.Cr.App.1973), and cases there cited. And this is true even where there has been a prior agreement or stipulation. *Romero,* at p. 213. More recently we have reemphasized the rule that results of a polygraph test are inadmissible "for all purposes." *Nethery v. State,* 692 S.W.2d 686, 700 (Tex.Cr.App.1985). See also *King v. State,* 511 S.W.2d 32 (Tex.Cr. App.1974); *Robinson v. State,* 550 S.W.2d 54, 59 (Tex.Cr.App.1977); *Fernandez v. State,* 564 S.W.2d 771 (Tex.Cr.App.1978); *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr. App.1981).

Appellant recognizes the rule but urges the State opened the door to such testimony and relies upon *Lucas v. State,* 479 S.W.2d 314 (Tex.Cr.App.1972). In *Lucas* the contention was whether the court erred in allowing the district attorney to testify the defendant had not passed a lie detector test. The defendant had earlier testified the district attorney had agreed to dismiss the assault with intent to rape charge if he

passed the polygraph test, that he took the test and the results showed he was not guilty, that the district attorney had told him the polygraph test indicated he was not the person who assaulted the prosecutrix, and that he (district attorney) did not believe him (defendant) to be guilty of the offense charged.

In rebuttal the district attorney testified, among other things, that the defendant did not pass the polygraph test. Recognizing the rule about evidence as to the results of polygraph examinations, this Court held the defendant "opened the door" for the State to introduce the complained of testimony citing Article 38.24, V.A.C.C.P. (rule of completeness). It should be noted that the defendant had initially gone into the conversation with the district attorney about the test results.

 In the instant case appellant claims the State "opened the door" leaving the inference with the jury that Rodriguez had passed the polygraph test. He calls attention to excerpts from the testimony of Investigators Chacon and Vargas and Chief Nunley, noting that Chacon mentioned the polygraph examination (not the results). The record reflects that it was appellant who elicited from Chacon on cross-examination that a polygraph test had been given to Rodriguez and attempted to also elicit from Chacon the results. The court stopped such interrogation.[5] Using this as a basis appellant takes excerpts from the testimony from three different witnesses to advance his claim. These excerpts merely show questions and answers about whether the officers had obtained physical evidence items, clothing, other than the disputed palm print. These excerpts do not show an attempt on the part of the State to leave the impression that Rodriguez had passed the polygraph examination. *Lucas* is clearly distinguishable. Appellant's point of error is overruled.

---

**5.** Although the point of error deals with Martinez's testimony, appellant complains in his brief that earlier the court itself had interrupted, without objection from the State and prevented him from eliciting the results of the test from Chacon. Appellant overlooks the teach-

ings of *Romero* and *Nethery.* The court's action was proper. Once the interruption occurred there was an objection from the State although one was not necessary to justify the court's action.

Appellant also urges the trial court erred in denying his motion to authorize reasonable investigative expenses in excess of the statutory limit for appointed counsel for an indigent defendant. He claims that such action deprived him of the effective assistance of counsel and of the equal protection and the due process of the law in violation of the federal and state constitutions.

Appellant's appointed counsel filed a pretrial motion to authorize the employment of an investigator. It was granted and the court authorized the hiring of an investigator of appellant's own choice and authorized the expenditure of funds up to $500.00, the maximum allowed by Article 26.05, § 1(d), V.A.C.C.P. A little over two weeks later appellant filed his "Motion to Authorize Reasonable Expenses in Excess of the Statutory Limit." A week later a pretrial hearing was conducted on the motion. The only witness was Cosme Muniz, the investigator hired by the appellant. He testified that the reasonable rate of compensation for private investigation work in Hidalgo County was between $25.00 and $45.00 an hour. He calculated that "approximately" 24 hours had been spent on appellant's case, amounting to $600.00, "besides mileage, long distance calls and so forth." He stated that his investigation of the case had not been completed, but there were no funds available. He testified there were still witnesses he had not had an opportunity to talk to, that he had not seen a list of the State's witnesses, nor had he had an opportunity to examine the physical evidence the State intended to introduce, had not had an opportunity to assist defense counsel in examining the jury list "expected to be coming forth for this case" and he would not have an opportunity to assist counsel during trial if his employment was terminated. The motion was overruled.

■ The allowance of investigative expenses is a matter within the sound discretion of the trial court, and an abuse of that discretion will not be found absent a showing of harm. *Quin v. State*, 608 S.W.2d 937, 938 (Tex.Cr.App.1980); *Myre v. State*, 545 S.W.2d 820, 826 (Tex.Cr.App.1977).

See also *Day v. State*, 704 S.W.2d 438, 440 (Tex.App.—Amarillo 1986).

It has been said that Article 26.05, § 1(d), supra, authorizes the trial court to reimburse defense counsel for investigative expenses only *after* they are incurred; that a trial court's decision to provide funds for expenses *before* those expenses are incurred is discretionary. *Phillips v. State*, 701 S.W.2d 875, 894 (Tex.Cr.App.1985); *Wallace v. State*, 618 S.W.2d 67, 70 (Tex. Cr.App.1981). "The record must reflect some specific need for the funds, such as the need for a particular expert or witness, and in what manner the defendant will be harmed if the funds are not provided." *Phillips*, supra, at 895.

Appellant acknowledges the constitutional validity of Article 26.05, § 1(d), supra, has been raised before, but that this Court has yet to address the issue because in those cases the record in the trial court failed to show a specific need, how the appellant was harmed, or that expenses had in fact been denied. See, e.g., *Reed v. State*, 644 S.W.2d 479, 481 (Tex.Cr.App. 1983); *Brasfield v. State*, 600 S.W.2d 288, 296 (Tex.Cr.App.1980); *Quin v. State*, supra; *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977).

Appellant contends his case is distinguishable because he showed he had utilized all of the funds made available "and made a showing of his specific need for additional funds *for reasonable investigation.*" (Emphasis supplied.) We do not agree.

■ The appellant received $500.00 for investigative fees not yet incurred, and then later requested additional money. The appellant failed to inform the court just how the original $500.00 had been used other than Muniz had spent approximately 24 hours on investigation. See and cf. *Lackey v. State*, 638 S.W.2d 439 (Tex.Cr. App.1982). The request was for additional funds for reasonable investigation, without a showing through Muniz's testimony as to a specific need for a particular expert or witness, etc., or any showing of how the appellant would be harmed if the funds were not provided. No later showing of

harm was made. In fact in attempting to distinguish his case from the cited cases appellant does not even address the question of harm. We find no abuse of discretion on the part of the trial court in overruling the motion for additional funds. We do not reach the constitutional questions. The point of error is overruled.

Appellant next complains of the trial court's action in excusing for cause prospective juror Maria Echavarria "because she did not state that her attitude toward the death penalty would substantially impair her from performing her duties as a juror...."

Appellant concedes that Echavarria gave conflicting answers concerning how she would perform her duties at the penalty stage of the trial, however, appellant relies on two instances during voir dire examination which she stated "that she could follow the law." Appellant urges the court erred in excusing her for cause.

Initially, in response to inquiry by the court, Echavarria stated she would feel "bad" about the death penalty, that she had not given the subject any thought, didn't know her church's views and did not think she could assess death as punishment. When the Texas procedure was explained she indicated she could find a defendant guilty if convinced beyond a reasonable doubt but would answer one of the special issues "no" to avoid the death penalty. At another point she told the prosecutor, "I think we would have to go by what the law says." And when asked if she could answer the special issues "Yes" she answered, "Maybe." Then the following inquiry by the court took place:

"Q. Knowing that if you answer both of them 'Yes,' I will assess his punishment at death, or would you deliberately answer it 'No,' to avoid that so he could get life. Is that what you would do?

"A. Yes.

"Q. Are you sure that that's what you would do?

"A. Yes.

"Q. Okay. However, bad the circumstances or the fact situations were, you would forgive, as you said earlier in your testimony, this is the time that you would forgive and answer one of the questions 'No,' so that he would not get the death penalty?

"A. (Nods head.)

"Q. Is there any question in your mind? You have to answer he is writing it down.

"A. Okay. No.

"Q. *There is no question in your mind?*

"A. *No.*" (Emphasis supplied.)

At this point defense counsel questioned Echavarria, and concluded his voir dire with the following question:

"Q. * * * I am asking you if you could consider assessing the death penalty. Obviously, I am not asking you to commit yourself to do that, because you haven't heard any evidence. But assume that the evidence convinced you that the defendant was guilty, could you consider, as the law would require you to do, to assessing either the death penalty or life in prison, depending upon what the evidence will show you?

"A. *Yes.*" (Emphasis supplied.)

Following this testimony the trial judge completed the voir dire process as follows:

*"BY THE COURT:*

"Q. As I understand what you just told him now, that you could consider the death penalty?

"A. Well, stating that we have to go by what the law says.

"Q. Yes, if you take that oath now and the death penalty is one of the punishments for capital murder, could you consider that, and if you thought it was proper, join with eleven other jurors and return that sort of a verdict? You just don't write 'death,' on a piece of paper and send it to me. You answer the questions. That's how I sentence the defendant. And you told me that you would deliberately answer one of them 'No.' But right now, you said that you would not consider the death penalty. Is your mind made up at this time that you would deliberate-

ly answer one of them 'No,' to avoid the death penalty?

"A. Okay. I didn't understand him very well.

"Q. Okay. So what your answer is, would you consider the death penalty?

"A. What I said first.

"Q. *In other words, that you would be deliberately answering one of the questions 'No,' so he would—regardless of the evidence, so he would get the death penalty?*

"A. *Yes.*" (Emphasis supplied.)

Thereafter the court excused the prospective juror for cause over the objection that "she stated affirmatively that she could consider the full range of punishment."

The standard applied to determine if a prospective juror is qualified is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) [reaffirming the standard established in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)]. This Court has also adopted the *Witt* standard on several occasions.

"The proper standard for excusing a prospective juror on the State's motion for cause is where the record viewed as a whole supports the finding that the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and oath. *Wainwright v. Witt* (citation omitted). In adopting this standard, the Court dispenses with *Witherspoon's* reference to automatic decision making and the requirement that a juror's bias be proved with unmistakable clarity." (Footnote omitted.) *Montoya v. State,* — S.W.2d —, — (No. 69,186, Feb. 18, 1987), at Slip Op. 4; see also *Ex parte Russell,* 720 S.W.2d 477, 482 (Tex.Cr. App.1986); *Mann v. State,* 718 S.W.2d 741, 746, n. 3 (Tex.Cr.App.1986); *Clark v. State,* 717 S.W.2d 910, 915 (Tex.Cr. App.1986); *Carter v. State,* 717 S.W.2d 60, 74–75 (Tex.Cr.App.1986); *Hogue v.*

*State,* 711 S.W.2d 9, 17, n. 3 (Tex.Cr.App. 1986); *Sharp v. State,* 707 S.W.2d 611, 620 (Tex.Cr.App.1986); *McKay v. State,* 707 S.W.2d 23, 30 (Tex.Cr.App.1985).

In applying the *Witt* standard to the instant case, it becomes obvious that Echavarria's views would "prevent or substantially impair" the performance of her duties as a juror in accordance with her instructions and her oath. A juror who would ultimately be guided by her personal beliefs rather than the law is not qualified to sit on a jury. See *Landry v. State,* 706 S.W.2d 105 (Tex.Cr.App.1985). Furthermore, substantial deference is paid to the trial judge who sees and hears the juror. *Wainwright v. Witt,* 105 S.Ct. at 853. In the instant case the trial judge questioned Echavarria and concluded that she was not qualified to sit on the jury, since she testified that she would deliberately answer one of the special issues "no" to avoid the death penalty. Viewing the prospective juror's testimony in its entirety, we concur with the trial court's decision to excuse her for cause. See *Sharp v. State,* 707 S.W.2d 611, 619–21 (Tex.Cr.App.1986). Appellant's seventh point of error is overruled.

Another point of error claims the trial court erred in denying appellant's motion for mistrial upon discovery that State's witness Willie Rocha had been allowed to testify at the guilt stage of the trial without being placed under oath. The record shows that appellant's trial counsel invoked "the rule" prior to the presentment of testimony. Subsequently, the trial judge asked "all the witnesses" to stand and be sworn. The judge then instructed the witnesses as to the meaning of the "rule." Thereafter during the trial, the court's attention on two occasions were called to witnesses who had not been previously sworn and they were before testifying.

Willie Rocha, Mercedes police officer, was called by the State during the presentation of its case-in-chief at the guilt stage of the trial. He testified that he had stayed at the hospital with the deceased on July 15, 1983, and related the description of the assailant the victim gave, the fact he used a knife, etc., as earlier mentioned in

this opinion. Rocha's testimony as to the victim's description of his assailant was cumulative of the testimony of the victim's wife who also was at the hospital.

Rocha was later called by the State as a reputation witness at the penalty stage of the trial. The State informed the court Rocha needed to be sworn as a witness:

"MR. GUERRA: We need to swear this witness in.

"THE COURT: I am going to go through the whole thing right now. Mr. Rocha, I have been advised that you testified in the case on the guilt and innocence stage of this case, did you not, sir?

"MR. ROCHA: Yes, sir.

"THE COURT: Did you testify in this case before?

"MR. ROCHA: Yes, I did, Your Honor.

"THE COURT: All right. And someone advised me today that you were not sworn at that time, is that true?

"MR. ROCHA: That is correct, sir.

"THE COURT: All right. You were not sworn in at any time?

"MR. ROCHA: No, sir.

"THE COURT: You were not sworn in with the other witnesses out there, or, I, individually, did not swear you in?

"MR. ROCHA: No, sir.

"THE COURT: All right. Raise your right hand, please. 'You do solemnly swear that testimony that you are about to give in this case now on trial will be the truth, the whole truth, and nothing but the truth, so help you God.'

"MR. ROCHA: Yes, sir.

"THE COURT: Let me ask you, under that oath, 'Do you now affirm all of the testimony that you gave before when you testified?'

"MR. ROCHA: Yes, I do, Your Honor."

Rocha did not qualify as a reputation witness and upon objection he did not testify at the penalty stage of the trial. The next morning the appellant for the first time moved for a mistrial because Rocha had been permitted to testify without being sworn. The mistrial motion was overruled.

This issue was recently addressed in great detail by this Court in *Beck v. State*, 719 S.W.2d 205 (Tex.Cr.App.1986). In *Beck*, supra, we scrutinized the applicable rules in criminal and civil cases under state and federal jurisdictions, and determined that the requirement that a witness be sworn is a right which the defendant can waive.

" 'While the statute requires a witness to be sworn, yet this is a right which defendant can waive. *If he desires the witness sworn, diligence requires that he should see to it during the trial. It is too late after verdict to complain for the first time that a witness was not sworn even if the witness testified for the State.* Goldsmith v. State, 32 Crim. 115 [32 Tex.Cr.R. 112], 22 S.W. 405; Ogden v. State, 58 S.W. 1018; Coleman v. State, 43 Crim. 15, 63 S.W. 322; Dodd v. State, 44 Crim. 480, 72 S.W. 1015; Barnes v. State, 61 Crim. 37, 133 S.W. 887; Porter v. State, 137 Crim. 473, 131 S.W.2d 964; Villarreal v. State, 152 Crim. 369, 214 S.W.2d 464.' See also Spriggs v. State, [163 Tex.Cr.R. 167], 289 S.W.2d 272 (Tex.Cr.App.1956); Brown v. State, [171 Tex.Cr.R. 692], 353 S.W.2d 425 (Tex.Cr.App.1961); Tex.Jur.3rd, Vol. 24, § 3264, p. 652." (Emphasis supplied.) *Beck*, supra, at 211–12 (quoting Branch's Ann.P.C., 2nd Ed., Vol. 1, § 370, p. 392).

Similarly, in *Beltran v. State*, 684 S.W.2d 772, 773 (Tex.App.—Waco 1984, no writ), it was noted that even if the record showed that the testifying police officer was *not* sworn, "such error was waived by failure of defendant to object to his testimony."

In *Beck*, supra, at 211, we also noted that almost every right, constitutional and statutory, may be waived by the failure to object. See also *Borgen v. State*, 672 S.W.2d 456 (Tex.Cr.App.1984); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976); *Evans v. State*, 444 S.W.2d 641 (Tex.Cr.App.1969). Furthermore, an objection to the unsworn testimony must be timely, and comes too late if made after the verdict or on motion for new trial. The purpose for the contemporaneous objection rule is to call the trial court's attention to the failure to swear a witness, so that the irregularity can easily be remedied.

In the instant case no objection was made at the time Officer Rocha testified at the guilt stage of the trial. Unlike the situation in *Beck*, where defense counsel carefully avoided cross-examining the unsworn witness in an effort to avoid the waiver rule, appellant's defense counsel proceeded to cross-examine the officer. It was not until after the verdict had been received at the guilt stage of the trial and during the punishment stage, a day after he learned the witness had not been sworn, that appellant moved for a mistrial. We now hold that such action or objection, under the circumstances presented, was not timely and therefore the right to demand that Officer Rocha be sworn was waived. Appellant's point of error is overruled.

Appellant further contends that the trial court erred in denying appellant's motion to quash the indictment. In that motion appellant argued that the indictment was fatally defective because it failed to properly allege the procedural provisions as set forth in Article 37.071(b)(1), (2), (3), V.A.C. C.P., concerning special issue submission.[6] The effect of this omission, appellant states, is that Article 21.03, V.A.C.C.P., is violated because the indictment fails to include everything which is necessary to be proved. Appellant also analogizes the capital murder provisions of Article 37.071(b), supra, to the punishment provisions of V.T. C.A., Penal Code, § 12.42 and 12.43, which provide for the enhancement of punishment. "If the State intends to enhance a defendant's punishment under either of these sections [§§ 12.42 and 12.43], it is well-established that the indictment must allege the prior conviction which the State intends to prove. *Coleman v. State*, 577 S.W.2d 486 (Tex.Cr.App.1979)." Consequently, if the State seeks the death penal-

ty appellant feels the procedural provisions of Article 37.071(b), supra, should be alleged in the indictment to provide adequate notice.

Appellant's identical contention was addressed by *Aranda .v. State*, 640 S.W.2d 766 (Tex.App.—San Antonio 1982). Aranda also argued "that just as the indictment must allege the enhancement allegation in a case involving enhancement of punishment, so must it allege the special issues of Article 37.071, supra, in a capital murder case." The Court of Appeals noted that Aranda's "logic is not persuasive," and held that the indictment sufficiently alleged the elements of capital murder, providing the defendant fair notice of the charges against him.

"[T]he very fact of a capital murder indictment places the defendant on notice that conviction will result in either life imprisonment or the death penalty. Id., §§ 19.02(b), 12.31(a). Clearly, the defendant so charged is also placed on notice that the legal procedure to be followed in the event of conviction for capital murder is that stated in Tex.Code Crim.Pro.Ann. art. 37.071 (Vernon 1981)." *Aranda*, supra, at 770.

The Court of Appeals also pointed out the distinction between the notice provided in a capital murder indictment, and the requirement that enhancement of punishment will be sought by the State. "Without that notice [of enhancement], a defendant would not know until the punishment stage that the State would seek greater punishment." *Aranda*, supra, at 770.

*Aranda* relied on this Court's decision in *Vigneault v. State*, 600 S.W.2d 318, 330 (Tex.Cr.App.1980), in which we held "that appellant was not denied notice that the special issues prescribed by Article 37.-

---

**6.** Article 37.071, V.A.C.C.P., provides in relevant part:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any by the deceased."

071(b), supra, would be submitted to the jury at the punishment phase of his trial." Vigneault argued that the special issues should not have been submitted to the jury since they were not included in the indictment. The basis of this argument, as noted in *Aranda*, was that special issue submission is governed by the principles of civil law. However, we rejected this notion by citing the special issues included in Article 37.071(b), supra, which place "the capital defendant in a substantially different position as regards notice thereof, from that of a civil litigant." *Vigneault*, supra, at 330.

■ The contention that appellant was not provided with adequate notice regarding the death penalty is also without merit in light of the long standing rule that the State cannot waive the death penalty. *Sorola v. State*, 693 S.W.2d 417, 418 (Tex.Cr. App.1985); *Ex parte Bailey*, 626 S.W.2d 741, 743 (Tex.Cr.App.1981) (Onion, P.J., concurring); *Ex parte Dowden*, 580 S.W.2d 364, 366 (Tex.Cr.App.1979); *Batten v. State*, 533 S.W.2d 788 (Tex.Cr.App.1976). We now hold that a defendant who is charged under a capital murder indictment is effectively put on notice that the special issues under Article 37.071(b), supra, will be submitted to the jury at punishment in the event that a guilty verdict is returned. Appellant's point of error is overruled.

■ Finally, in another point of error appellant alleges trial court error in denying the motion to quash and dismiss the indictment. It is argued that the allegation in the indictment, that appellant "did then and there intentionally and knowingly cause the death ..." is vague and indefinite and does not adequately state an offense under Sec. 19.03(a)(2).[7] Appellant contends § 19.03(a)(2) unequivocally states that the mental state required for an offense thereunder is "intentionally" and the instant indictment alleges "intentionally and knowingly." Appellant urges this

Court to overrule *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979) [vacated on other grounds, 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 987 (1981)], in which we upheld an indictment worded in the same form. We refuse to do so, especially since our reasoning in *Wilder* has recently been readopted in *East v. State*, 702 S.W.2d 606, 616 (Tex.Cr.App.1985).

Appellant's last point of error is also overruled. The judgment is affirmed.

TEAGUE and CLINTON, JJ., dissent and expressly dissent to the disposition that is made of points of error numbers 3, 6, and 7.

---

7. V.T.C.A., Penal Code, § 19.03(a)(2), provides: "(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

\* \* \* \* \* \*

"(2) the person *intentionally* commits the murder in the course of committing or attempting to commit kidnapping burglary, robbery, aggravated sexual assault, or arson;" (Emphasis supplied.)